[Civ. No. 36744. Second Dist., Div. One. Apr. 15, 1971.]

ALBERT DAVIS, Plaintiff and Respondent, v.
LOCAL UNION NO. 11, INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, AFL-CIO, Defendant and Appellant.

688

## COUNSEL

Brundage, Neyhart, Miller, Ross & Reich and Julius Reich for Defendant and Appellant.

Sheppard, Mullin, Richter & Hampton and David A. Maddux for Plaintiff and Respondent.

## OPINION

**LILLIE, J.**—A jury found in plaintiff's favor in a malicious prosecution action brought against defendant Union and assessed both compensatory and exemplary damages against it. The Union appeals from judgment entered on the verdict, order denying its motion for judgment notwithstanding the verdict and order denying motion for new trial. The attempted appeal from the latter order is dismissed.

 First, the Union argues that there is no substantial evidence that it acted without probable cause in instituting the prior proceeding, it being conceded that the existence of the other elements of the tort (favorable termination of the prior action and malice) may not here be properly challenged. Remaining points concern the award of damages and the assertedly erroneous exclusion of relevant evidence.

At the times in question plaintiff was an electrical contractor employing three men when he launched that business in 1962; John Stephen Harrington was an assistant business manager of Local 11 who initiated the prior suit and whose actions in that regard were determined to be attributable to his employer, defendant Union. Upon going into the electrical contracting business plaintiff went to the union hall, there met with Harrington and signed the current (1961-1964) collective bargaining agreement ("Inside Wiremen's Agreement") between Local 11 and the local chapter of the National Electrical Contractors Association, an employers' group. Since he was not a member of this latter organization, plaintiff also signed a document entitled "Non-Association Member Signing Union Agreement," also referred to as "Letter of Assent." (According to the Union under this second document electrical contractors were bound by the outcome of negotiations between the Union and the employers' group (above referred to) unless either the contractor or the Union gave prior notice that it did not wish to be so bound.)

In June of 1964 plaintiff fell behind in his payments to the pension fund provided for by the Inside Wiremen's Agreement; on June 8, 1964,

a letter was admittedly sent to plaintiff by Harrington, acting for the Union, stating in pertinent part that his agreement with Local 11 "is herein cancelled." Upon receipt of this letter, plaintiff phoned Harrington, telling him that the pension payments had in fact been made; Harrington, according to plaintiff, stated he would check the records and phone him back; Harrington never did so, and plaintiff testified that for that reason he considered his contractual relations with the Union at an end. Harrington, on the other hand, took the position that his letter of June 8 was a nullity because of a provision in the pertinent agreement that employers, delinquent in payments, shall be terminated after 72 hours' notice in writing unless satisfactory proof be made that delinquent payments have been made.

Shortly thereafter a new Inside Wiremen's Agreement, effective July 1, 1964, was entered into between Local 11 and the same local chapter of the employers' group. Although he continued to do things called for by the new agreement, including payments to the pension fund and calling the hiring hall for workmen, plaintiff refused to sign an instrument which would formally make him a party thereto despite repeated attempts by Harrington to have him do so. Given as plaintiff's reasons for his refusal were some of the economic provisions of the agreement, including the posting of a $5,000 performance bond. In November of 1964, Local 11 removed its members, at Harrington's instance, from plaintiff's place of business; this was done, Harrington stated, to force plaintiff to sign the 1964 agreement by exerting some "economic pressure."

Also in November of 1964, Local 11, acting through Harrington, filed charges before the Joint Electrical Industry Committee (referred to as JEIC), a grievance adjustment board composed of three representatives named by the Union and three by the contractors. Although apprised of the nature of such charges and the date of the hearing, plaintiff made no appearance; the hearing was continued to another date, plaintiff being notified thereof, but he again failed to appear. (In his brief, plaintiff argues that he failed to appear because he was not a member of the employers' group and thus had no impartial representative on the committee, which he refers to as a "Kangaroo Court.") On the continued date (the Union's case being presented by Harrington) it was found that plaintiff had failed to comply with certain provisions of the 1964 agreement, and ordered his compliance therewith. Admittedly no mention was made by Harrington at the above hearing of his June 8, 1964, letter to plaintiff.

On April 4, 1965, plaintiff was personally notified of the JEIC award and, some two weeks later, a petition to confirm such award was filed by

Local 11 in the Los Angeles Superior Court. Although Harrington admittedly neither told the Union's lawyers about his letter to plaintiff of June 8 nor disclosed to them that plaintiff had repeatedly refused to sign the 1964 Inside Wiremen's Agreement, the Union's petition (to confirm the award) contained a verified allegation that neither party (Local 11 or plaintiff) had given notice of such cancellation of the agreement which, it was further alleged, was in full force and effect. On motion of plaintiff, the proceeding was thereafter removed to the federal district court where responsive pleadings were filed accompanied by a copy of the June 8 letter. Also filed was a motion to vacate the award. Upon service of this motion, counsel for Local 11 thereafter telephoned plaintiff's attorneys and admitted that the Union had never advised its counsel that the agreement had been cancelled; plaintiff's attorneys were also advised that the Union would stipulate that the award could be vacated. Thereafter the federal court granted plaintiff's motion, expressly finding that "said notice of cancellation clearly, plainly and unequivocally cancelled any and all collective bargaining agreements between Albert Davis and Local Union No. 11." The instant action for malicious prosecution was subsequently commenced.

The foregoing recital of events concerns only the issue of probable cause, matters relating to damages and other assignments of error are disclosed later herein.

 At the outset, it is not quite correct for the Union to assert that lack of probable cause is not a jury question but one for the court to decide as a matter of law. Cited for the Union's assertion are such cases as *Masterson* v. *Pig'n Whistle Corp.,* 161 Cal.App.2d 323 [326 P.2d 918], and *Kassan* v. *Bledsoe,* 252 Cal.App.2d 810 [60 Cal.Rptr. 799], which so hold; but, as therein pointed out, the question must be determined by the court (as a matter of law) only when there is no dispute concerning the existence of the facts relied on to establish this particular element of the tort which is defined in *Kassan* as "a suspicion founded upon circumstances sufficiently strong to warrant a reasonable person in the belief that the charge is true." (*Supra,* p. 816.) Thus, as also therein stated, "It is essential to the plaintiff's case that there be substantial evidence to create a conflict or an inference of lack of probable cause. [Citation.] . . . If a plaintiff acts in the institution of the complained-of action upon the opinion and advice of counsel to the effect that he had a good cause of action after laying all of the facts of the case, in good faith, before said counsel, it is held that probable cause therefore is established. [Citation.]" (P. 816.) Unlike the situation above described, in the case at bar it was contended by plaintiff that Harrington was lacking in good faith when he failed to inform the JEIC

and, thereafter, the Union's counsel who filed the petition to confirm, that plaintiff had never signed the 1964 agreement; since this, and other considerations, tended to show want of probable cause, the trial court properly concluded that the evidence bearing on the instant question was in conflict, if only by the drawing of reasonable inferences, and correctly left the question to the jury for its determination. At this stage of the proceedings, therefore, we must be guided by the settled rule laid down in *Northrup* v. *Baker,* 202 Cal.App.2d 347 [20 Cal.Rptr. 797], that "On appeal, the findings of the trier of fact as to such matters will not be disturbed unless it can be held that they are not supported by substantial evidence in the record [citation]." (P. 355.)

*Northrup* v. *Baker, supra,* 202 Cal.App.2d 347, points up the familiar appellate principle that when two or more reasonable inferences can be drawn from the facts, the reviewing court is without power to substitute its deductions for those of the trier of fact. Since the whole basis of the prior action against plaintiff was the existence of a valid contract between him and Local 11, there was evidence that Harrington, for one, did not believe that any such agreement was in effect before the date charges were filed with JEIC. Plaintiff testified that repeated efforts were exerted by Harrington to make him a signatory to the necessary instrument. Even more persuasive was the testimony of one Crick (appearing under subpoena), a member of Local 11, who once worked for plaintiff and was called off the job under orders of his union. Asked to give the substance of a conversation with Harrington on that occasion he said, "We were called into the hall the next day, shall I say, and we were told Mr. Davis was not a signatory to the agreement and that we shouldn't go back to work for him. In essence that was what it was." "If there is evidence with respcet to the actual belief of the defendant sufficient to warrant a conclusion that he did not in fact believe the truth of the charge, the question of probable cause to that extent involves a question of fact to be submitted to the jury." (*Centers* v. *Dollar Markets,* 99 Cal.App.2d 534, 543 [222 P.2d 136].) Additionally, there is the impact of the excerpt from the *Kassan* decision; since Harrington did not give all of the facts to the Union's counsel, his failure to do so thus warranted an inference that he was actuated by sinister motives not predicated on a good faith belief that plaintiff should be disciplined for neglecting to comply with the so-called 1964 agreement.

Wholly apart from the above circumstances, construed in light of the law most applicable thereto, there is this concession by the Union in its opening brief: "The trial court had before it, as an indication that Harrington recognized that the June 8, 1964, letter cancelled the parties'

contract, and inferentially, evidence that there was no probable cause to have sued Davis the fact that Harrington had asked Davis to sign the new 1964 agreement and had pulled Davis' men from his jobs for this object." Such concession is qualified, however, since it is made in pursuance of the additional point that evidence of lack of probable cause was limited to Harrington in his capacity as the Union's employee and should not be attributable to his principal, defendant here. We proceed to this subsidiary contention without further discussion of the several evidentiary items which, according to the Union, show that Harrington was acting in an honest belief that plaintiff had breached the agreement in question. ▇▇▇▇ All such items,[1] though ably argued, simply presented a conflict which was adversely resolved by the jury and, later, by the trial court's denial of the two motions (judgment notwithstanding verdict and new trial). "Even though contrary inferences could reasonably have been drawn, the appellate court cannot make contrary findings where the trial court is supported by substantial proof. [Citation.]" (*Caldwell* v. *Farley*, 134 Cal.App.2d 84, 90 [285 P.2d 294].)

The *Caldwell* case is cited in 30 Cal.Jur.2d, Labor, § 137, p. 88, for the following propositions: "Like other employers, a union is liable for the torts, including the malicious torts, of its employees committed in the scope of their employment. This liability extends beyond the union's actual control over the conduct of its employees, and includes the wrongful acts of an agent where such acts are a part of the business the agent was employed to conduct." Briefly, the facts there were that plaintiff expressed his opinion to others at the job site upon the inadvisability of a strike by defendant Union; when this was subsequently communicated to defendant Farley, a union steward, bitter words were exchanged between him and plaintiff and, as plaintiff started to walk away, Farley clubbed plaintiff with a wooden board. There was evidence that plaintiff belonged to the plasterers' union and that Farley, a member of the hod-carriers' union, had been employed by the latter union to report all grievances. The court made the following observation here pertinent: "If Farley was hired to represent the union to settle minor disputes as the trial judge observed, then 'what he did in the scope of that authority, he did not merely as an individual, but as a representative of the union.'" (P. 91.) In so doing the appellate court rejected the union's claim that the battery was motivated by Farley's personal anger and therefore outside the scope of his employment. Precisely the same contention is made in our case by defendant Union. ▇▇▇ Thus, it asserts that the evidence only reflects a lack of probable

[1] This includes the *"Auten"* case filed in federal court (*Auten* v. *Local 11, Internat. etc. of Elect. Workers* (S.D. Cal. 1965) 58 L.R.R.M. 2531).

cause as to Harrington, not to it, and that his bad faith, if any, cannot be imputed to his principal. But he was the "agent in charge" of an area covering approximately 100 contractors; as business agent, he admitted that he had authority to decide whether to take economic sanctions against an employer and to bring charges before the JEIC. As in *Caldwell,* whatever Harrington did, he did as a representative of the Union.

There is likewise no merit to the companion contention by Union that when good faith is involved the uncommunicated knowledge of an agent is not imputed to the principal; consequently, the Union concludes, it cannot be said to have lacked probable cause in commencing the prior proceeding unless Harrington laid all the facts pointing to his bad faith before it. Cases are legion in support of the following statement of the law found in 2 Cal.Jur.2d, Agency, § 160, p. 855: "The general rule is that when an agent, while acting within the scope of his authority, acquires knowledge, or receives notice, of any fact material to the subject matter of the agency, his principal is charged with constructive notice of that fact." The Union nevertheless invokes a decision-approved exception to the above rule that where bad faith on the agent's part is involved, the principal must have actual knowledge thereof; such was the case in *Harte* v. *United Benefit Life Ins. Co.,* 66 Cal.2d 148 [56 Cal.Rptr. 889, 424 P.2d 329], an action by a surviving wife to recover the proceeds of an insurance policy. In *Harte,* apparently the wife knew, though her husband did not, that he was suffering from a fatal disease when the policy was delivered; the trial court granted defendant's motion for a nonsuit holding that plaintiff was her husband's agent and was aware of her husband's real condition. Such holding was held to be error "since the principal's good faith must be determined on the basis of facts of which he had actual knowledge." (*Supra,* p. 153.) Since the reviewing court further concluded that the case was not one in which the evidence showed that the agent (wife) was guilty of fraud to be charged to the principal (husband) and since, as the court also noted, the jury could have concluded that she otherwise acted in good faith (unlike Harrington), we think it should be limited to the facts there existing, certainly a far cry from the instant one for malicious prosecution where the agent's bad faith was impliedly found by the jury. Moreover, it has been held that in an action for damages for fraud (on the sale of a house), the knowledge of an agent is imputable to the principal. (*Herzog* v. *Capital Co.,* 27 Cal.2d 349, 353 [164 P.2d 8].)

The Union next asserts that there was no substantial evidence supporting the award of damages, either compensatory or exemplary. ■ In an action of this type, "damages may be recovered for 'loss of time, deprivation of liberty, . . . injury to fame, reputation, character, . . .

mental suffering, general impairment of social and mercantile standing, injury to credit, . . . and all losses sustained to plaintiff's business as the direct and natural result of the proceedings complained of.' [Citation.]" (*Ray Wong* v. *Earl C. Anthony, Inc.*, 199 Cal. 15, 18 [247 P. 894].) The jury was instructed in language substantially in accord with the foregoing, including the additional item of attorney's fees incurred, and awarded compensatory damages in the sum of $7,500. There was evidence that plaintiff became obligated to pay attorney's fees amounting to $735; as to this item the Union contends that although plaintiff should have taken steps to mitigate this and other losses, he failed to do so. There was also evidence that plaintiff lost at least two jobs because of the litigation instituted by Local 11. According to plaintiff, on the so-called Sheriff job he would have made approximately $3,500; on the job for Woodman Enterprises a profit of between $3,500 and $3,700 would have been realized. Both Mr. Sheriff and Stanford Kaiser (a partner in Woodman Enterprises) testified that plaintiff would have been given the electrical work on their projects except for the lawsuit then pending with the Union. As with the issue of probable cause, the Union has ably argued evidentiary matters which have warranted the drawing of contrary inferences—for example, there was no causal connection between plaintiff's lost profits on the above jobs and the lawsuit filed by Union because the latter could have been concluded prior to each project's commencement except for delays attributable to plaintiff's counsel. However, for reasons already stated, the choice of reasonable inference is for the jury and not this court.

The Union urges that plaintiff's duty to mitigate (or minimize) damages applied not only to attorney's fees but to the loss of profits from his business —"A person injured by the wrongful act of another is bound . . . to exercise reasonable care and diligence to avoid loss or minimize the resulting damages and cannot recover for losses which might have been prevented by reasonable efforts and expenditures on his part." (*Valencia* v. *Shell Oil Co.*, 23 Cal.2d 840, 844 [147 P.2d 558].) In *Valencia* plaintiff's truck was damaged when it was hit by a tank which fell from a truck belonging to defendant; reference was made in the decision to other cases wherein it was held that an owner's recovery for being deprived of the use of a damaged truck is generally to be determined with reference to the period of time reasonably required for the making of repairs. In the present case, however, we are referred to no California authority for the proposition that the doctrine of mitigation of damages is applicable to malicious prosecution actions; in that regard, plaintiff properly points out that damages in such an action result from the filing of the prior lawsuit and, until that is done, there are no damages to be mitigated. Such argument seems to accord with the statement in *Valencia* that "The duty to minimize

damages does not require an injured person to do what is unreasonable or impracticable, . . ." (*Supra,* p. 846.)

Concluding our discussion of compensatory damages, the jury was properly instructed that such damages could be awarded "even if the extent of those damages cannot be accurately measured. Where exact measurement of damages cannot be made, it is your duty, acting with good sense and as reasonable men, to form from the evidence the best estimate of damages that can be made under the circumstances." ▮ The evidence justifies the aggregate award here in light of the rule that it is the province of the jury, and then of the trial court upon motion for new trial, to determine and fix the amount of damages to be awarded; too, absent any showing of passion and prejudice, all presumptions are in favor of the correctness of the judgment. (*Lerner* v. *Glickfield,* 187 Cal.App.2d 514, 526 [9 Cal. Rptr. 686].)

▮ The jury also assessed punitive damages in the sum of $8,000. Again the Union argues that Harrington's ill will or malice cannot be imputed to his principal; cited is the libel by newspaper case of *Davis* v. *Hearst,* 160 Cal. 143, 164-165 [116 P. 530], for the further contention that actual malice (as distinguished from malice in law or implied malice) must exist to justify an award of exemplary damages. It was concluded in the *Davis* case, as well as in *Deevy* v. *Tassi,* 21 Cal.2d 109 [130 P.2d 389], that a principal is not liable for exemplary damages for an agent's act unless such act has been specifically directed or generally suggested by the principal, or unless the principal himself has personally participated in the commission thereof, or has subsequently ratified it with full knowledge of all facts attending its commission. First, with reference to the matter of ratification, it has been held in several cases that proof thereof can be established by the principal's retention of the employee after full knowledge of the facts. (*Sandoval* v. *Southern Cal. Enterprises, Inc.,* 98 Cal. App.2d 240, 250 [219 P.2d 928].) At the trial Harrington testified that he was still employed by Local 11 as assistant business manager, which (he agreed) was the "No. 2 job with the union." Further than that there was personal participation by the Union, within the meaning of the *Davis* decision, in that "the particular act [came] within the principal's specific directions or general suggestions." (*Supra,* p. 165.) The term "general suggestions" would include, according to *Davis,* "that class of cases where the policy and conduct of a newspaper show that its proprietor has given his subordinates *carte blanche* to do anything and everything that will make the paper a financial success and demonstrate its superior enterprise as a news disseminator. Herein is implied a willingness of the proprietor to publish libels against anybody, and it would, of course, afford strong evidence of malice in fact. . . ." (*Supra,* p. 165.) By reasonable analogy,

the evidence here shows that Harrington, as its No. 2 man, was given *carte blanche* to take all necessary action to compel plaintiff to sign the new agreement. Likewise pertinent is the statement of the court in *Lowe* v. *Yolo County etc. Water Co.,* 157 Cal. 503, 510-511 [108 P. 297], wherein an award of exemplary damage was upheld: "It is not disputed, of course, that a corporation may be held guilty of malice or oppression by reason of acts of those whom it has placed in charge of its affairs and who 'constitute, to all purposes of dealing with others, the corporation.' [Citation.]" In our view, therefore, the award of the exemplary damages was not erroneous.

There is no merit to the Union's final point that the trial court erroneously excluded certain proffered testimony. Such testimony, while not wholly irrelevant, was of doubtful probative value and was properly excluded by the court under the discretionary powers granted by section 352, Evidence Code. Certainly it may not validly be urged that the rulings warranted a reversal. (Evid. Code, § 354.)

The judgment and order are affirmed.

Wood, P. J., and Thompson, J., concurred.

A petition for a rehearing was denied May 12, 1971, and appellant's petition for a hearing by the Supreme Court was denied June 23, 1971. McComb, J., did not participate therein.