[Civ. No. 52890. Second Dist., Div. Three. May 29, 1979.]

DONALD RHODE, Plaintiff, v.
NATIONAL MEDICAL HOSPITAL OF
MONTEREY PARK, INC.,
Defendant and Respondent;
SYBRON CORPORATION, Defendant and Appellant;
PACIFIC EMPLOYERS INSURANCE COMPANY,
Intervener and Appellant.

COUNSEL

Buck, Molony, Nimmo & Ammirato and Mark D. Rutter for Defendant and Appellant.

Hagenbaugh & Murphy and Thomas E. Hammack for Intervener and Appellant.

No appearance for Defendant and Respondent.

OPINION

KLEIN, P. J.— In this case, we are presented with an appeal and a cross-appeal from a judgment entered in favor of a workers' compensation insurance carrier which intervened in an action brought by an injured employee against two third party defendants (Lab. Code, §§ 3852, 3853).

On May 5, 1972, Donald Rhode injured his back during the course of his employment as an outside television technician. The physician to whom he was referred, Dr. Clayton Ching, diagnosed the injury as a herniated disk, probably at the interspace between the numbers 4 and 5 lumbar vertebrae (hereinafter L4-5) although a rupture between the number 5 lumbar vertebra and number 1 sacral vertebra (hereinafter L5-S1) could have produced similar findings. A myelogram was subsequently performed which showed a defect at the L4-5 level.

On July 11, 1972, Dr. Ching performed a laminectomy and disk excision on Rhode to repair the L4-5 damage. Dr. Ching did not explore the L5-S1 area during the operation. An examination conducted in the recovery room and two subsequent examinations performed the next day, July 12, indicated that Rhode's back condition had improved by virtue of the surgery.

At approximately 10:15 during the evening of July 12, 1972, Rhode was attempting to roll over in his hospital bed in order to attain a more comfortable position when the handrail of the bed collapsed in his grasp, causing him to twist his back and fall partially out of the bed. Immediately after the incident, Rhode felt a great deal of pain in his lower back area extending down his right leg and experienced numbness

in his left leg. An examination by Dr. Ching the next morning revealed that Rhode's nerve roots were much more irritable than they had been before the fall from the bed.

After Rhode was discharged from the hospital on July 17, 1972, his condition worsened. Dr. Ching, believing that Rhode had ruptured another disk at the time of the bed incident, prescribed further surgery. On August 17, 1972, Dr. Ching performed a laminectomy and disk excision to correct a disk rupture at the L5-S1 level. Although Dr. Ching's records reflected that this second surgery was somewhat successful, it appears that Rhode was still experiencing lower back and leg pain at the time of trial.

Following his second surgery, Rhode brought an action to recover damages for the injuries he allegedly suffered as a result of his fall from the hospital bed. The defendants identified in Rhode's first amended complaint were Garfield Hospital (Garfield),[1] the hospital in which the incident occurred, and Sybron Corporation (Sybron), the manufacturer of the hospital bed handrail which collapsed in Rhode's grasp. In addition, Pacific Employers Insurance Company (Pacific), the workers' compensation insurance carrier for Rhode's employer, brought an action in intervention against the same two defendants for reimbursement of the amount of workers' compensation benefits which Pacific was allegedly required to pay Rhode as a result of the hospital bed incident.

At the conclusion of a jury trial, a special verdict was returned finding Garfield and Sybron liable to Rhode in the amount of $15,000 (substantially less than he had asked for) and liable to Pacific in the amount of $1,000. A judgment was subsequently entered in accordance with the jury's verdict,[2] and Rhode's and Pacific's motions for a new trial were denied. ▆▆ Pacific now appeals from the judgment entered in its favor, claiming that the amount awarded was inadequate.[3] Sybron cross-appeals from the judgment, contending that Pacific's action in intervention should have been dismissed with respect to it.[4]

---

[1]Garfield was sued under the name National Medical Hospital of Monterey Park, Inc.

[2]It appears that the trial court determined that Garfield was entitled to be indemnified by Sybron for the liability incurred by Garfield because of the defective handrail.

[3]Pacific also purports to appeal from the order denying its motion for a new trial. Since the order is nonappealable, the purported appeal therefrom is dismissed. (*Armenta* v. *Churchill* (1954) 42 Cal.2d 448, 451 [267 P.2d 303].) The order is, however, reviewable on appeal from the judgment. (*Hamasaki* v. *Flotho* (1952) 39 Cal.2d 602, 608 [248 P.2d 910].)

[4]Sybron also purports to cross-appeal from the order of the trial court denying its motion to dismiss. Such an order being nonappealable (*Perry* v. *Magneson* (1929) 207

I

PACIFIC'S APPEAL

At trial, it was established that the amount of workers' compensation benefits Pacific had paid to Rhode with reference to the May 1972 industrial injury was $49,851.03. Of this amount, $22,457.05[5] was said by Pacific to be properly attributable to the May 1972 accident. Proceeding under the theory that the remainder, or $27,393.98, was attributable to the injuries suffered by Rhode when he fell from his hospital bed, Pacific claimed below that it was entitled to a reimbursement for this latter sum from the parties who were responsible for the hospital bed incident. (See *Duprey* v. *Shane* (1952) 39 Cal.2d 781, 790 [249 P.2d 8]; *Dodds* v. *Stellar* (1947) 30 Cal.2d 496, 500 [183 P.2d 658].)

On appeal, Pacific asserts that the evidence was insufficient to support a judgment in its favor in any amount less than $27,393.98. In company with this assertion, Pacific also contends that the trial court erred in the following two respects: (1) when it failed to either direct a verdict for Pacific in the sum of $27,393.98 or give a requested instruction to the effect that if the jury should find for Pacific it must do so in the amount of $27,393.98, and (2) when it refused to grant a new trial. ■ In view of the fact that there is a substantial basis in the record for the jury's determination that Pacific should receive less than $27,393.98, we conclude that all of Pacific's related contentions are without merit.[6]

Cal. 617, 620 [279 P. 650]), the purported appeal therefrom is dismissed. The order is reviewable on appeal from the judgment, however. (*Ibid.*)

[5]The $22,457.05 figure was arrived at by taking the sum of the following: $5,992.53 for medical treatment related to the industrial injury; $772.24 in temporary disability payments made prior to Rhode's first surgery; $2,409.78, representing temporary disability payments covering the six-month period during which Rhode could have been expected to recover from the first surgery; and $13,282.50, representing the amount of permanent disability Rhode was entitled to receive as a result of physical restrictions imposed on him because of the May 1972 industrial accident.

[6]The presence of substantial evidence in the record to support the jury's determination that Pacific should be awarded less than the amount it claimed as its apportioned damages compels the conclusion that Pacific's request for a directed verdict (or special instruction which would have amounted to almost the same thing) was properly denied (see *Louisville Title Ins. Co.* v. *Surety Title & Guar. Co.* (1976) 60 Cal.App.3d 781, 787) [132 Cal.Rptr. 63]) and also prevents this court from disturbing the trial court's exercise of discretion in denying Pacific's motion for a new trial (*Charles D. Warner & Sons, Inc.* v. *Seilon, Inc.* (1974) 37 Cal.App.3d 612, 617 [112 Cal.Rptr. 425]).

The principal area of dispute at trial centered about the question of whether Rhode's disk injury at the L5-S1 level, which necessitated the second surgery, was properly attributable to the hospital bed incident or whether it was, in fact, an aftermath of the industrial accident. In attempting to prove that the L5-S1 injury was due to Rhode's fall from the bed, Pacific relied principally upon the testimony of Dr. Ching. Dr. Ching's testimony, however, was contradicted at several crucial points. For example, while Dr. Ching stated that he believed it highly improbable that anyone could have disk ruptures at both the L4-5 and L5-S1 levels at the same time, it was established at trial that Rhode himself had been operated on at both levels following a lifting injury some 20 years prior to the incidents in question. In addition, although Dr. Ching testified that it was possible for him to determine within 24 hours of the first surgery that the operation at the L4-5 level was successful in alleviating Rhode's back problems, thereby implying that no additional disk damage was present at that time, several of the defense's expert witnesses testified that no such determination could be made within so short a period after surgery.

Dr. Ching's ultimate conclusion, that the injury at the L5-S1 level was probably due to Rhode's fall from the hospital bed, was likewise contradicted by other expert testimony. For example, Dr. William Hitzselberger, a neurosurgeon, opined that it was not possible for Rhode's movements in the hospital bed to have caused a rupture of the L5-S1 disk. Dr. Randolph Cockrell, Jr., an orthopedic specialist, testified that the probability of the bed incident having caused the injury at the L5-S1 level was "rather remote." Dr. Richard Witten, a radiologist, testified similarly. Indeed, Dr. Ching himself admitted in a deposition taken prior to trial that the L5-S1 injury could have been caused by factors other than the bed accident.

Pacific acknowledges that on the basis of the above described conflict in the testimony there would have been substantial evidence to support a judgment entirely in the defendants' favor. But given that the jury actually resolved the conflicts by returning a verdict in Pacific's favor, Pacific argues that it was entitled to the full amount which it had apportioned to the second disk injury, namely, $27,393.98. Pacific submits that this is so because its evidence regarding the apportionment was uncontradicted by the defense, which failed to introduce any evidence on damages.

■ It is well settled, however, that "[a] reviewing court must uphold an award of damages whenever possible [citation]. . . ." (*Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 61 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878].) "[I]t is the province of the jury, and then the trial court upon motion for new trial, to determine and fix the amount of damages to be awarded; . . . absent any showing of passion and prejudice, all presumptions are in favor of the correctness of the judgment. [Citation.]" (*Davis* v. *Local Union No. 11, Internat. etc. of Elec. Workers* (1971) 16 Cal.App.3d 686, 697 [94 Cal.Rptr. 562]; see also *Ward* v. *Litowsky* (1970) 5 Cal.App.3d 437, 440 [85 Cal.Rptr. 278].)

■ In the case at bench, it would appear that while the jury believed that Pacific had, to a limited extent, suffered damages because of the tortious conduct of defendants, it did not accept Pacific's basic theory that Rhode's injury at the L5-S1 level was due to the bed incident. Instead, it appears that the jury agreed with the suggestion made by Garfield's attorney in closing argument to the effect that the hospital bed accident had merely caused an incidental aggravation of existing medical problems and that therefore Pacific should only be awarded whatever additional compensation benefits it was required to pay because of that aggravation. Indeed, the trial court, in ruling on Pacific's motion for a new trial, accepted this explanation as a possible basis for the jury's verdict.[7]

Granted, there may not have been any specific evidence introduced at trial upon which the jury's award of $1,000 can be said to have been predicated. The absence of such evidence, of course, may be traced to the fact that the parties chose to take absolutist positions at trial, with the defendants disclaiming any responsibility for Rhode's second back surgery while Pacific argued that it was entitled to be reimbursed for the entire sum it had apportioned to that second operation. Faced with such conflicting evidence, the jury obviously struggled to reach some middle ground which it believed was consistent with the true state of affairs. Since it was Pacific which, as the plaintiff in intervention, had the burden of proving damages (see *Chaparkas* v. *Webb* (1960) 178 Cal.App.2d 257, 259 [2 Cal.Rptr. 879]), it is perhaps the defendants, or more particularly

---

[7]In denying the new trial motion, the court noted the following: ". . . I'm sure they [the jurors] felt the same way about the complaint in intervention as [they] did the plaintiff. That he, the insurance carrier, was not entitled to that $29,000—whatever that figure was, $25,000 or $29,000—because the guy had a pre-existing condition, which was unrelated to the twisting incident. [¶] And so for the aggravation for that period that was caused by the twisting incident, you got paid that [$1,000]."

Sybron, who has cause to complain about the absence of evidence to justify the verdict.

## II

### SYBRON'S CROSS-APPEAL

■ Sybron's cross-appeal challenges the trial court's refusal to dismiss Pacific's complaint in intervention for Pacific's failure to effect service of summons on Sybron within the three-year period mandated by Code of Civil Procedure section 581a, subdivision (a).

The record reflects that Rhode filed his original complaint on June 11, 1973, naming Garfield and several Does as defendants. On September 12, 1973, Pacific filed its original complaint in intervention, incorporating the allegations in Rhode's complaint and specifically naming Garfield as a defendant. Garfield filed an answer to the complaint in intervention on October 23, 1973, and on May 31, 1974, was granted leave to file a cross-complaint for indemnity against Sybron. On November 14, 1975, Rhode was given permission to file an amended complaint for the purpose of substituting Sybron for a Doe defendant in the original complaint. Sybron answered Rhode's amended complaint on February 2, 1976.

On January 12, 1977, just prior to jury selection, Pacific made an oral motion for permission to amend its complaint in intervention in order "to allege product defect in strict liability as to each defendant." The motion was granted, and on January 25, 1977, during the course of trial, Pacific filed an amended complaint in intervention which incorporated by reference the allegations in Rhode's amended complaint and consequently named Sybron as a substitute for a Doe defendant. The amended complaint in intervention was served on Sybron that same day. Sybron's motion to dismiss the complaint in intervention pursuant to the provisions of Code of Civil Procedure section 581a was both made and denied on February 1, 1977.[8] Sybron's motion was based on the asserted impropriety of the lapse of over three years between the filing of the original complaint in intervention on September 12, 1973, and the service of the amended complaint in intervention on January 25, 1977.

---

[8]Sybron refused to cross-examine any of Pacific's witnesses in order to prevent any appearance of waiver of its rights under Code of Civil Procedure section 581a.

■ Code of Civil Procedure section 581a, subdivision (a) provides for the mandatory dismissal of an action commenced by complaint "unless the summons on the complaint is served and return made within three years after the commencement of said action. . . ." The three-year period generally begins to run from the filing of the original complaint and is not extended by an amendment thereto. (*Elling Corp.* v. *Superior Court* (1975) 48 Cal.App.3d 89, 94 [123 Cal.Rptr. 734]; *Perati* v. *Atkinson* (1964) 230 Cal.App.2d 251, 252-254 [40 Cal.Rptr. 835]; but see *J. A. Thompson & Sons, Inc.* v. *Superior Court* (1963) 215 Cal.App.2d 719 [30 Cal.Rptr. 471], disapproved in part in *Cross* v. *Pacific Gas & Elec. Co.* (1964) 60 Cal.2d 690, 694 [36 Cal.Rptr. 321, 388 P.2d 353].)

■ Subdivision (a) of section 581a, however, specifically states that service of summons within the three-year period is not required when "the party against whom the action is prosecuted has made a general appearance in the action." Sybron acknowledges that it made a general appearance in the action commenced by Rhode prior to the running of the three-year period against the complaint in intervention, but argues that its appearance in Rhode's action was of no consequence to the issue in question since Pacific's intervention must be deemed a separate action for purposes of applying Code of Civil Procedure section 581a.

We disagree. Although we have not discovered any authority directly on point, the authority which does exist would appear to support the trial court's denial of Sybron's motion to dismiss. Code of Civil Procedure section 387, subdivision (a) describes the concept of intervention in the following terms: "Upon timely application, any person, who has an interest in the matter in litigation, or in the success of either of the parties, or an interest against both, may intervene *in the action or proceeding.* An intervention takes place when a third person is permitted to become a party *to an action or proceeding between other persons. . . .*" (Italics added.) ■ The italicized portion of the quoted language strongly suggests that an intervention under the Code of Civil Procedure is not to be treated as a separate action, but rather is to be viewed as coming within the original, main action. This analysis is consistent with our Supreme Court's observation in *Belt Casualty Co.* v. *Furman* (1933) 218 Cal. 359, 362 [23 P.2d 293], that the main purpose of intervention is "to obviate delay and multiplicity of actions by creating an opportunity to those directly interested in the subject matter to join *in an action already instituted.*" (Italics added.)

Further indication that intervention does not create a separate action in the sense which Sybron argues for is found in the rule that an intervener joining on the side of a plaintiff does so in subordination to the plaintiff's right to control the action. (*Mann* v. *Superior Court* (1942) 53 Cal.App.2d 272, 280 [127 P.2d 970]; 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 207, pp. 1879-1880.) In *Smith* v. *Trapp* (1967) 249 Cal.App.2d 929 [58 Cal.Rptr. 229], the court specifically noted the applicability of this rule to the type of situation before us, stating: "Although an intervener has the status of a party-plaintiff, the injured employee is the primary plaintiff who is in control of the case and is recognized as the dominant party." (*Id.,* at p. 936.)

In addition, dismissing Pacific's complaint in intervention for failure to effect service within the three-year period allowed by Code of Civil Procedure section 581a would not advance the purpose behind the statute, which is "to compel reasonable diligence in the prosecution of an action after it has been commenced [citations] and 'expedite litigation and require it to be brought to conclusion within reasonable time limits. [Citations.]' " (*McKenzie* v. *City of Thousand Oaks* (1973) 36 Cal.App.3d 426, 429-430 [111 Cal.Rptr. 584]; see also *Flamer* v. *Superior Court* (1968) 266 Cal.App.2d 907, 915 [72 Cal.Rptr. 561].) Rhode's diligent prosecution of the main action, which Sybron had appeared in, was sufficient to insure that Pacific's action in intervention would likewise be diligently prosecuted.

The cases cited by Sybron are not controlling. In *Floyd Neal & Associates, Inc.* v. *Superior Court* (1977) 72 Cal.App.3d 734 [140 Cal.Rptr. 301], the appellate court, in dicta, did state that once a complaint in intervention has been validly filed it becomes "an independent action with a life of its own. . . ." (*Id.,* at p. 739.) However, the authority cited by the *Floyd Neal* court for this proposition, *J. A. Thompson & Sons, Inc.* v. *Superior Court, supra,* 215 Cal.App.2d 719, contained no discussion of the nature of intervention; rather, the holding in *J. A. Thompson* was merely that in cases wherein a new party plaintiff is added by amendment to a complaint, the computation of the three-year period for service under Code of Civil Procedure section 581a should be deemed to commence as of the time of the amendment. (*Id.,* at p. 722.)

In fact, the actual holding in *Floyd Neal* supports rather than undermines the trial court's ruling herein. In that case, an insurer filed a subrogation action against the petitioner to recover workers' compensation benefits it had paid to an employee who was injured in a traffic

accident. The insurer, however, failed to effect service within the required three-year period and the petitioner made no appearance in the action until after the expiration of the period. Thereafter, the employee filed a complaint in intervention in the insurer's action. Upon the petitioner's motion pursuant to Code of Civil Procedure section 581a, the trial court dismissed the insurer's action but refused to dismiss the employee's complaint in intervention. ▇ On petition for writ of mandate, the Court of Appeal held that the employee's complaint in intervention should also have been dismissed (*Floyd Neal & Associates, Inc.* v. *Superior Court, supra,* 72 Cal.App.3d 734, 738-739), thus reaffirming the principle that the vitality of an action in intervention is linked to the vitality of the main action in which the intervention is sought.

Sybron cites *Market-Front Co.* v. *Superior Court* (1969) 271 Cal.App.2d 505 [76 Cal.Rptr. 526] (disapproved in part in *Denham* v. *Superior Court* (1970) 2 Cal.3d 557, 563 [86 Cal.Rptr. 65, 468 P.2d 193]) as suggesting that complaints in intervention are subject to the mandatory dismissal provisions of Code of Civil Procedure section 581a. The court in *Market-Front,* however, merely held that if discretionary dismissal of an employee's third party action was proper under Code of Civil Procedure section 583 for failure to prosecute, then it would also be proper to dismiss a compensation carrier's complaint in intervention in the absence of any opposition by the carrier. (*Id.,* at pp. 507-508.)

We note finally that acceptance of Sybron's argument on this point could lead to anomalous results. Pursuant to Labor Code section 3853, an employer or his representative may intervene in an action brought by an employee "at any time before trial on the facts. . . ." Had Sybron's motion to dismiss in the case at bench been granted, Pacific's only remedy would presumably have been an appeal since the commencement of the trial would have barred the filing of another action in intervention. If, however, Sybron had succeeded in obtaining a dismissal pursuant to Code of Civil Procedure section 581a prior to trial, then Pacific could presumably have simply filed a new complaint in intervention since the dismissal would not have been on the merits of Pacific's claim. (*Elling Corp.* v. *Superior Court, supra,* 48 Cal.App.3d 89, 96.) The applicable one-year statute of limitations would not have been a bar to the filing of a new action since Pacific, standing in the shoes of Rhode's employer, would have been entitled to rely on Rhode's compliance with the statute. (*DeMeo* v. *St. Francis Hosp.* (1974) 39 Cal.App.3d 174, 177 [114 Cal.Rptr. 280].)

■ On the basis of the foregoing, we conclude that the trial court correctly denied Sybron's motion to dismiss Pacific's complaint in intervention.[9]

## Disposition

Pacific's purported appeal from the order denying a new trial and Sybron's purported cross-appeal from the order denying its motion pursuant to Code of Civil Procedure section 581a are dismissed. The judgment is affirmed. Each party is to bear its own costs on appeal.

Allport, J., and Potter, J., concurred.

---

[9]This holding renders unnecessary any discussion of whether Sybron could be considered to have been a "new party" for whom the three-year period of Code of Civil Procedure section 581a would not have begun to run until the filing of the amended complaint in intervention. (See *Elling Corp.* v. *Superior Court, supra,* 48 Cal.App.3d 89, 94.) We note only that if Sybron were treated as a "new party," Pacific would experience immediate problems with the statute of limitations. (*Id.,* at pp. 95-96.)