[L.A. No. 30747. Aug. 14, 1979.]

MICHAEL EGAN, Plaintiff and Respondent, v.
MUTUAL OF OMAHA INSURANCE COMPANY et al.,
Defendants and Appellants.

**COUNSEL**

Pettit, Evers & Martin, Joseph W. Rogers, Jr., Robert J. Heil, Ferguson, Hoffman, Henn & Mandel, Kaplan, Livingston, Goodwin, Berkowitz & Selvin, Herman F. Selvin, Sheldon W. Presser, Peter C. Bronson, Poindexter & Doutre, Alfred B. Doutre and Robert A. Seligson for Defendants and Appellants.

Beardsley, Hufstedler & Kemble, Seth M. Hufstedler, Peter O. Israel, Charles A. O'Brien, Don B. Kates, Jr., O'Brien & Hallisey, Ropers, Majeski, Kohn, Bentley & Wagner, Michael J. Brady, Adams, Duque & Hazeltine, James S. Cline and Kilmer G. Casteel as Amici Curiae on behalf of Defendants and Appellants.

Hafif & Shernoff, Herbert Hafif, William M. Shernoff and Stephen L. Odgers for Plaintiff and Respondent.

William P. Camusi, Wylie A. Aitken, Leonard Sacks, Robert E. Cartwright, Robert G. Beloud, LeRoy Hersh, David B. Baum, Stephen I. Zetterberg, Ned Good, Arne Werchick, Sanford M. Gage and Roger H. Hedrick as Amici Curiae on behalf of Plaintiff and Respondent.

**OPINION**

**MOSK, J.**—Defendants appeal from a judgment awarding compensatory and punitive damages for breach of an insurance contract. We conclude

the judgment should be affirmed insofar as it awards compensatory damages against defendant Mutual of Omaha Insurance Company (Mutual) but reversed in all other respects.

In 1962, plaintiff purchased a health and disability insurance policy from defendant Mutual through its Los Angeles representative, the Hall-Worthing Agency (agency). The policy provided for lifetime benefits of $200 per month in event the insured became totally disabled as a result of either an accidental injury "independent of sickness and other causes" or sickness sufficiently severe to cause confinement of the insured to his residence. Benefits for a nonconfining illness were payable for a period not to exceed three months.

Between 1963 and 1970 plaintiff claimed and received payments for three separate back-related disabling injuries. In May 1970, he made a fourth claim for accidental back injury suffered during the course of his employment. Portions of the claim form were completed by both plaintiff and his physician. The physician estimated plaintiff would be able to return to work in August 1970. In September plaintiff visited the agency and discussed his claim. This discussion resulted in payment under the policy's accident provisions for a three-month period following date of injury.

Plaintiff filed a supplemental claim in October 1970, stating he was unable to return to work. Because his physician indicated on the claim form that plaintiff could have returned to work on September 29, defendant McEachen, an agency claims manager, reviewed workers' compensation and State Compensation Insurance Fund medical records. These records disclosed that plaintiff and the examining physician had agreed he would return to work on July 1, 1970.

On November 20, McEachen visited plaintiff at home. McEachen testified he merely discussed contradictions in the claim form and agreed to discuss the matter later after further investigation. Plaintiff testified that McEachen informed him no further benefits were due because he was not actually disabled but simply unable to find work, that he told McEachen employment was available through his labor union but because he still suffered from his injury he was unable to accept such employment, and that he was willing to be examined by any doctor of Mutual's choice.

In February 1971, as a result of inquiry from Mutual's home office, McEachen addressed a letter to plaintiff enclosing payment of benefits through September 29, 1970. The letter stated the check represented full payment of benefits due under the policy.

On February 26, 1971, surgery was performed on plaintiff's back, and he submitted another claim to the agency. The physician's portion of this claim form included an estimate by the surgeon that plaintiff could return to work "Possibly 3-6 months from date of surgery." This claim was assigned to defendant Segal, an agency claims adjuster, who was aided in his field investigations by claims analyst Romano from Mutual's home office. Although not entirely clear, it appears Romano was assigned to the agency to assist in a backlog of field investigations. Romano was not Segal's superior; rather, he occupied a position equivalent to that of Segal in the agency.

Segal and Romano, in the course of their field investigations, reviewed records of Workers' Compensation Appeals Board, State Compensation Insurance Fund, and the hospital where plaintiff's surgery was performed. State Compensation Insurance Fund records contained letters from Dr. Carpenter, plaintiff's surgeon, and Dr. Singelyn. Dr. Carpenter wrote in his letter: "[Plaintiff's medical] history appears consistent with a man with probable discogenic disease with multiple aggravations over the last several years, finally culminating in a specific incident a little over seven months ago. . . ." Dr. Singelyn declared in his letter: "I would apportion 50% of his current subjective complaints to his industrial injury, and 50% to the natural progression of his preexisting pathology of degenerative wear and tear osteoarthritis of the spine." Neither Segal nor Romano made any effort to contact plaintiff's physicians. Trial testimony established that efforts to discuss the case with attending physicians would ordinarily have been made by a claims adjuster. Based on Segal's review of medical records, plaintiff's condition was reclassified from injury to nonconfining illness.

In May 1971 Segal visited plaintiff at home, telling him he suffered from an illness, not an injury. Segal handed plaintiff a check for medical costs and three months' maximum disability payments. Plaintiff did not cash the check. He testified he refused Segal's offer for a larger check if plaintiff would surrender his policy. He further testified that after discussing the matter with Dr. Carpenter, he wrote to Segal concerning his reclassification but received no answer.

Segal testified he was certain he acted at the direction of some higher authority during the May 1971 meeting, although he could not recall who directed him. Mutual's files contained no written directive to Segal. Gustin, head of Mutual's continuing disability claims division, attempted to explain the absence of any identifiable person in authority at Mutual's home office to receive and review Segal's reports. He testified plaintiff's file had not been in his department after December 1970, and that it may have "fallen . . . into a crack."

Subsequently, plaintiff received a 73 percent disability rating on his workers' compensation claim. Not returning to work, he remained under medical care. In July 1972, at plaintiff's request, the Department of Insurance asked Mutual to review plaintiff's file and report to the department within 15 days. The nature of Mutual's response, if any, is unclear; it was not produced at trial.

In 1973, plaintiff commenced the present action for compensatory and punitive damages against Mutual, Segal and McEachen. The trial court, in directing a verdict against defendants, ruled as a matter of law that defendants' failure to have plaintiff examined by a doctor of their choice or to consult with plaintiff's treating physicians and surgeon violated the covenant of good faith and fair dealing. The court submitted to the jury the issues of causation, compensatory and punitive damages. The jury returned verdicts against all defendants. General damages of $500 and punitive damages of $400 were assessed against Segal. General damages of $1,000 and punitive damages of $500 were assessed against McEachen. Mutual was held liable for $45,600 in general damages, $78,000 for emotional distress, and $5 million in punitive damages.

I

The directed verdict on the issue of breach of covenant of good faith and fair dealing rests on Mutual's inadequate investigation of plaintiff's claim. Mutual argues that an insurer violates this covenant in a disability insurance contract only if it wrongfully denies a claim knowing it has no reasonable basis for doing so, and that the ruling herein improperly subjects it to strict liability in tort for breach of contract. We disagree. For the reasons discussed below, we conclude that an insurer may breach the covenant of good faith and fair dealing when it fails to properly investigate its insured's claim.

In addition to the duties imposed on contracting parties by the express terms of their agreement, the law implies in every contract a covenant of good faith and fair dealing. (*Comunale* v. *Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 658 [328 P.2d 198, 68 A.L.R.2d 883]; see also Comment, *Extending the Insurer's Duty of Good Faith and Fair Dealing to Third Parties Under Liability Insurance Policies* (1978) 25 UCLA L.Rev. 1413, 1418-1424.) The implied promise requires each contracting party to refrain from doing anything to injure the right of the other to receive the benefits of the agreement. (*Murphy* v. *Allstate Ins. Co.* (1976) 17 Cal.3d 937, 940 [132 Cal.Rptr. 424, 553 P.2d 584]; *Crisci* v. *Security Ins. Co.* (1967) 66 Cal.2d 425, 429 [58 Cal.Rptr. 13, 426 P.2d 173]; *Comunale* v. *Traders & General Ins. Co., supra,* 50 Cal.2d at p. 658.) The precise nature and extent of the duty imposed by such an implied promise will depend on the contractual purposes.

This court has previously addressed the extent of the duties imposed by the implied covenant in liability insurance policies. (*Johansen* v. *California State Auto Assn. Inter-Ins. Bureau* (1975) 15 Cal.3d 9 [123 Cal.Rptr. 288, 538 P.2d 744]; *Crisci* v. *Security Ins. Co., supra,* 66 Cal.2d 425; *Comunale* v. *Traders & General Ins. Co., supra,* 50 Cal.2d 654.) We there held that the insurer, when determining whether to settle a claim, must give at least as much consideration to the welfare of its insured as it gives to its own interests. The governing standard is whether a prudent insurer would have accepted the settlement offer if it alone were to be liable for the entire judgment. (*Johansen,* at p. 16 of 15 Cal.3d; *Crisci,* at p. 429 of 66 Cal.2d.) The standard is premised on the insurer's obligation to protect the insured's interests in defending the latter against claims by an injured third party.

The implied covenant imposes obligations not only as to claims by a third party but also as to those by the insured. (*Silberg* v. *California Life Ins. Co.* (1974) 11 Cal.3d 452 [113 Cal.Rptr. 711, 521 P.2d 1103]; *Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566 [108 Cal.Rptr. 480, 510 P.2d 1032].) In both contexts the obligations of the insurer "are merely two different aspects of the same duty." (*Gruenberg* v. *Aetna Ins. Co., supra,* 9 Cal.3d at p. 573; accord, *Silberg* v. *California Life Ins. Co., supra,* 11 Cal.3d 452; *Fletcher* v. *Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376 [89 Cal.Rptr. 78, 47 A.L.R.3d 286].) "[W]hen the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability in tort." (*Gruenberg,* at p. 575 of 9 Cal.3d; accord, *Silberg,* at p. 461 of 11 Cal.3d; *Fletcher,* at pp. 401-402 of 10 Cal.App.3d.) For the insurer to fulfill its obligation not to impair the right

of the insured to receive the benefits of the agreement, it again must give at least as much consideration to the latter's interests as it does to its own. (*Silberg,* at p. 460 of 11 Cal.3d.)

■    The insured in a contract like the one before us does not seek to obtain a commercial advantage by purchasing the policy—rather, he seeks protection against calamity. As insurers are well aware, the major motivation for obtaining disability insurance is to provide funds during periods when the ordinary source of the insured's income—his earnings —has stopped. The purchase of such insurance provides peace of mind and security in the event the insured is unable to work. (See *Crisci* v. *Security Ins. Co., supra,* 66 Cal.2d at p. 434.) To protect these interests it is essential that an insurer fully inquire into possible bases that might support the insured's claim. Although we recognize that distinguishing fraudulent from legitimate claims may occasionally be difficult for insurers, especially in the context of disability policies, an insurer cannot reasonably and in good faith deny payments to its insured without thoroughly investigating the foundation for its denial.

Here the evidence is undisputed that Mutual failed to properly investigate plaintiff's claim; hence the trial court correctly instructed the jury that a breach of the implied covenant of good faith and fair dealing was established.

## II

. Civil Code section 3294 provides: "In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, express or implied, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant." Section 3294 was originally enacted in 1872, a minor amendment was adopted in 1905, and the statute has remained intact ever since. It is true that the concept of punitive damages has been criticized;[1]  but unless at this late date we were to hold the section unconstitutional—a proposition that has been frequently rejected (see, e.g., *Fletcher* v. *Western National Life Ins. Co., supra,* 10 Cal.App.3d at pp. 404-405; *Toole* v. *Richardson-Merrell Inc.* (1967) 251 Cal.App.2d 689, 719 [60 Cal.Rptr. 398, 29 A.L.R.3d 988];

---

[1]See, e.g.; Long, *Punitive Damages: An Unsettled Doctrine* (1976) 25 Drake L.Rev. 870; Carsey, *The Case Against Punitive Damages* (1975) 11 The Forum 57; Ghiardi, *The Case Against Punitive Damages* (1972) 8 The Forum 411; Note, *The Imposition of Punishment by Civil Courts: A Reappraisal of Punitive Damages* (1966) 41 N.Y.U.L.Rev. 1158.

*United States* v. *Regan* (1914) 232 U.S. 37, 46-49 [58 L.Ed. 494, 497-499, 34 S.Ct. 213])—we cannot usurp the Legislature's determination that such damages should be recoverable in cases in which the statutory prerequisites are fulfilled. (*Merlo* v. *Standard Life & Acc. Ins. Co.* (1976) 59 Cal.App.3d 5, 19-20 [130 Cal.Rptr. 416]; *Ferraro* v. *Pacific Fin. Corp.* (1970) 8 Cal.App.3d 339, 355 [87 Cal.Rptr. 226].)

In the present context, the principal purpose of section 3294 is to deter acts deemed socially unacceptable and, consequently, to discourage the perpetuation of objectionable corporate policies. (See *Ferraro* v. *Pacific Fin. Corp., supra,* 8 Cal.App.3d at p. 353 [punitive award to deter corporate policy of repossessing automobiles despite bona fide claims of ownership by third parties].) Traditional arguments challenging the validity of exemplary damages lose force when a punitive award is based on this justification. ■ The special relationship between the insurer and the insured illustrates the public policy considerations that may support exemplary damages in cases such as this.

As one commentary has noted, "The insurers' obligations are . . . rooted in their status as purveyors of a vital service labeled quasi-public in nature. Suppliers of services affected with a public interest must take the public's interest seriously, where necessary placing it before their interest in maximizing gains and limiting disbursements . . . [A]s a supplier of a public service rather than a manufactured product, the obligations of insurers go beyond meeting reasonable expectations of coverage. The obligations of good faith and fair dealing encompass qualities of decency and humanity inherent in the responsibilities of a fiduciary. Insurers hold themselves out as fiduciaries, and with the public's trust must go private responsibility consonant with that trust." (Goodman & Seaton, *Foreword: Ripe for Decision, Internal Workings and Current Concerns of the California Supreme Court* (1974) 62 Cal.L.Rev. 309, 346-347.) Furthermore, the relationship of insurer and insured is inherently unbalanced; the adhesive nature of insurance contracts places the insurer in a superior bargaining position. The availability of punitive damages is thus compatible with recognition of insurers' underlying public obligations and reflects an attempt to restore balance in the contractual relationship. (Hirsch et al., *Strict Liability: A Response to the Gruenberg-Silberg Conflict Regarding Insurance Litigation Awards* (1975) 7 Sw.U.L.Rev. 310, 326; Comment, *Egan v. Mutual of Omaha Insurance Co.: The Expanding Use of Punitive Damages in Breach of Insurance Contract Actions* (1978) 15 San Diego L.Rev. 287, 298-301; Note,

*Contracting for Punitive Damages: Fletcher* v. *Western National Life Insurance Company* (1971) 4 Loyola L.A. L.Rev. 208, 219-224.)

On this appeal, of course, we are governed by the familiar substantial evidence test of *Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183]. Determinations related to assessment of punitive damages have traditionally been left to the discretion of the jury; *Davis* v. *Hearst* (1911) 160 Cal. 143, 173 [116 P. 530], declares them to be "wholly within the control of the jury." (See also *Ferraro* v. *Pacific Fin. Corp., supra,* 8 Cal.App.3d at p. 351; *Sullivan* v. *Matt* (1955) 130 Cal.App.2d 134, 143-144 [278 P.2d 499].)[2] Here the propriety of punitive damages was also reviewed by the trial court when it rejected both defendants' motion for new trial and their motion for judgment notwithstanding the verdict. █ A brief analysis of the record convinces us that substantial evidence supports the jury's decision to assess punitive damages.

Plaintiff received his first payment from Mutual on the claim in issue herein only after a long delay and a personal visit to the claims office. When he requested additional payments as a result of his continuing inability to work, McEachen visited him at his home. Testimony was introduced that McEachen, although aware of plaintiff's good faith efforts to work, called plaintiff a fraud and told him that he sought benefits only because he did not want to return to work. McEachen advised plaintiff he was not entitled to any further payments and that past benefits received were also unwarranted, despite plaintiff's bona fide claim of accidental injury.[3] When plaintiff expressed his concern regarding the need for money during the approaching Christmas season and offered to submit to examination by a physician of Mutual's choice, McEachen only laughed, reducing plaintiff to tears in the presence of his wife and child.

After plaintiff received what Mutual designated his "final" payment, he was compelled to undergo back surgery. Segal visited plaintiff after he made further requests for total disability payments because he was confined to his home for medical reasons. Segal told him that he was not incapacitated from an accidental injury but had a "sickness" that could not qualify under the policy's total disability provision. Despite the lack

---

[2] Restatement Second of Torts, section 908, comment (d), includes the statement, "Whether to award punitive damages and the determination of the amount are within the sound discretion of the trier of fact, whether judge or jury."

[3] McEachen substantiated this assertion by claiming to have contacted plaintiff's treating physician, a claim not supported by the record.

of support for denying plaintiff's disability claim, Segal offered a "final" check under the policy's sickness provision, or a larger check if plaintiff would surrender the policy.[4] Other evidence reflected both Segal's and McEachen's knowledge that plaintiff had a 12-year-old child and a totally disabled wife. In short, the record as a whole contains substantial evidence from which the jury might reasonably find that defendant "acted maliciously, with an intent to oppress, and in conscious disregard of the rights of its insured." (*Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 923 [148 Cal.Rptr. 389, 582 P.2d 980].)

■ Mutual advances an alternate ground for reversal on the issue of punitive damages, i.e., that the actions of McEachen and Segal cannot be imputed to Mutual for this purpose. In a broad sense, it is correct to state that California follows the Restatement rule regarding assessment of punitive damages against a principal: "Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if, (a) the principal authorized the doing and the manner of the act, or (b) the agent was unfit and the principal was reckless in employing him, or (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or (d) the principal or a managerial agent of the principal ratified or approved the act." (Rest.2d Torts (Tent. Draft No. 19, 1973) § 909.) However, prior cases have not ascribed to the Restatement the narrow interpretation proposed by Mutual.[5]

Mutual argues that neither McEachen nor Segal can be considered "managerial employees" because neither was involved in "high-level policy making." ■ The determination whether employees act in a managerial capacity, however, does not necessarily hinge on their "level" in the corporate hierarchy. Rather, the critical inquiry is the degree of

---

[4]Of course, if there had been a reasonable and carefully investigated foundation for believing that plaintiff's injury did not fall within the scope of the policy coverage, the proposed settlement could not have been considered inappropriate and, accordingly, could not have entered into the jury's decision to award punitive damages.

[5]*Kuchta* v. *Allied Builders Corp.* (1971) 21 Cal.App.3d 541, 549-550 [98 Cal.Rptr. 588], and *Davis* v. *Local Union No. 11, Internat. etc. of Elec. Workers* (1971) 16 Cal.App.3d 686 [94 Cal.Rptr. 562], support the conclusion that McEachen was a "managerial employee" in a "policy-making position." In *Kuchta,* the actions of a franchisee with managerial authority comparable to that of McEachen were imputed to the principal for the purpose of fixing liability for punitive damages. The court in *Davis* similarly rejected defendant labor union's contention that the actions of its agent, merely an assistant business manager, could not be imputed to the union. These cases focus on the responsibilities of the agent, rather than merely his title, in assessing whether punitive damages are appropriate. To the extent that *Hale* v. *Farmers Ins. Exch.* (1974) 42 Cal.App.3d 681 [117 Cal.Rptr. 146], conflicts with the views expressed herein, we disapprove it.

discretion the employees possess in making decisions that will ultimately determine corporate policy. When employees dispose of insureds' claims with little if any supervision, they possess sufficient discretion for the law to impute their actions concerning those claims to the corporation.

■ We are satisfied that with respect to plaintiff's claim herein, the authority vested in McEachen and Segal was sufficient to justify the imposition of punitive damages against Mutual. The record demonstrates they exercised broad discretion in the disposition of plaintiff's claim. Moreover, McEachen's own description of his responsibilities at Mutual reflect his exercise of policy-making authority as a "managerial employee." He testified that his business card displayed to policyholders identified him as "Manager, Benefits Department, Mutual of Omaha." He further explained he was manager of the Los Angeles claims department for Mutual, and in that capacity had ultimate supervisory and decisional authority regarding the disposition of all claims, like that of plaintiff, processed through the Los Angeles office. Although Segal testified that he acted with directions from above, the record provides little support for this testimony; it appears, therefore, that with respect to plaintiff's claim he also possessed broad discretion. The authority exercised by McEachen and Segal necessarily results in the ad hoc formulation of policy.

In concluding that McEachen and Segal were managerial employees, we subscribe to the views of Justice Tamura in his concurring and dissenting opinion in *Merlo* v. *Standard Life & Acc. Ins. Co., supra,* 59 Cal.App.3d at page 25:[6] "It must be remembered that we are here concerned with an insurance company dealing in disability insurance, not just any corporation. Manifestly, to plaintiff, [the claims representative's] actions were actions of defendant. [The claims representative] personally managed the most crucial aspects of his employer's relationship with its policyholders. Defendant should not be allowed to insulate itself from liability by giving an employee a nonmanagerial title and relegating to him crucial policy decisions."

### III

■ We turn to the question whether the amount of the punitive damage award herein—$5 million—is excessive as a matter of law. We have recently reviewed the considerations governing appellate determina-

---

[6]The majority in *Merlo* did not decide the question of the managerial status of the defendant insurer's claims representative.

tion of such questions, and need not reiterate them at this time. (*Neal* v. *Farmers Ins. Exchange* (1978) *supra,* 21 Cal.3d 910, 927-928, and cases cited.) Applying those considerations to the case at bar, we observe first that the award of punitive damages is more than 40 times larger than the not-insubstantial assessment of $123,600 in compensatory damages against Mutual. In addition, the punitive damage figure herein represents two and one-half months of Mutual's entire net income in 1973, and more than seven months of such income in 1974. Viewing the record as a whole and in the light most favorable to the judgments, we conclude that in these circumstances the punitive damage award against Mutual must be deemed the result of passion and prejudice on the part of the jurors and excessive as a matter of law.

## IV

Segal and McEachen acted as Mutual's agents. As such, they are not parties to the insurance contract and not subject to the implied covenant. Because the only ground for imposing liability on either Segal or McEachen is breach of that promise, the judgments against them as individuals cannot stand. (*Gruenberg* v. *Aetna Ins. Co.* (1973) *supra,* 9 Cal.3d at p. 576.)

The judgment against Segal and McEachen is reversed. The judgment against Mutual is affirmed as to the award of compensatory damages[7] and reversed as to the award of punitive damages. Segal and McEachen shall recover their costs on appeal from plaintiff. Plaintiff and Mutual shall bear their own costs on appeal.

Bird, C. J., Tobriner, J., and Manuel, J., concurred.

**CLARK, J.,** Concurring and Dissenting.—I concur in the majority opinion insofar as it holds that included within the implied covenant of

---

[7]Mutual also contends that the compensatory damage award should be reversed because the trial court permitted the jury to award future policy benefits. It is true that in *Erreca* v. *Western States Life Ins. Co.* (1942) 19 Cal.2d 388, 402 [121 P.2d 689, 141 A.L.R. 68], this court allowed the recovery of only accrued benefits in an action for breach of a contract for disability insurance. We have never held, however, that future policy benefits may not be recovered in a valid tort cause of action for breach of the implied covenant of good faith and fair dealing, nor does defendant offer any compelling reason for extending *Erreca* to such actions. Thus, in applying to these facts the general rule for fixing tort damages (Civ. Code, § 3333), the jury may include in the compensatory damage award future policy benefits that they reasonably conclude, after examination of the policy's provisions and other evidence, the policy holder would have been entitled to receive had the contract been honored by the insurer. To the extent it is inconsistent herewith, *Austero* v. *National Cas. Co.* (1978) 84 Cal.App.3d 1, 24-25 [148 Cal.Rptr. 653], is disapproved.

good faith and fair dealing is a duty to properly investigate claims and that the evidence establishes as a matter of law that the insurer was negligent in investigating. I also concur in reversal of the judgment against Segal and McEachen. However, I dissent on two grounds from the majority's determination that a punitive damage award is permissible in this action.

First, punishing insurance companies for their settlement practices will necessarily result in the industry passing its punishment costs on to the public in the form of increased premiums. By unjustly enriching the claimant, the public ultimately punishes itself. Secondly, even assuming punitive awards are proper against an insurer for its settlement practices, the evidence is insufficient to sustain the instant award. Undisputed evidence shows that when McEachen and Segal were denying further benefits, all medical reports available to them warranted rejecting plaintiff's demands. An insurer should not be deterred from denying claims when the medical information supplied it by an insured's doctors reveals the claims are not compensable. Moreover, the conduct of McEachen and Segal may not be imputed to the insurer for purposes of sustaining an award intended as punishment.

## SELF PUNISHMENT

Civil Code section 3294 provides: "In an action for the breach of an obligation *not arising from contract,* where a defendant has been guilty of oppression, fraud, or malice, express or implied, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant." An action based on an implied covenant must be considered an action arising from contract.

Punitive damages are an anomaly in our civil jurisprudence. The civil law is concerned with vindicating rights and compensating persons for harm suffered as a result of infringement upon those rights. A plaintiff is customarily made whole for infringement by compensatory damages; punitive damages awarded to him rather than to the government constitute a windfall or unjust enrichment for plaintiff. (See, e.g., Carsey, *The Case Against Punitive Damages* (1975) 11 The Forum 57, 60; Note, *Insurance Coverage of Punitive Damages* (1974) 10 Idaho L.Rev. 263, 268.)

The purpose of punitive damage is to punish wrongdoers; deterring further commission of wrongful acts. (*Evans* v. *Gibson* (1934) 220 Cal.

476, 490 [31 P.2d 389]; Morris, *Punitive Damages in Tort Cases* (1931) 44 Harv.L.Rev. 1173, 1183.) In the usual case, risk of liability for compensatory damage provides a substantial deterrent against wrongful conduct, and additional deterrence furnished by the risk of punitive damage is marginal at best. (Long, *Punitive Damages: An Unsettled Doctrine* (1976) 25 Drake L.Rev. 870, 888; Ghiardi, *The Case Against Punitive Damages* (1972) 8 The Forum 411, 418; Note, *The Imposition of Punishment by Civil Courts: A Reappraisal of Punitive Damages* (1966) 41 N.Y.U.L. Rev. 1158, 1161-1173.)[1]

The principal criticism to the concept of punitive damage is that standards are so vague that the determination whether to award is left to absolute and unguided jury discretion. (*Brewer* v. *Second Baptist Church* (1948) 32 Cal.2d 791, 801 [197 P.2d 713]; *Ferraro* v. *Pacific Fin. Corp.* (1970) 8 Cal.App.3d 339, 351 [87 Cal.Rptr. 226].) And the damages when awarded are "wholly unpredictable amounts bearing no necessary relation to the actual harm caused." (*Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323, 350 [41 L.Ed.2d 789, 811, 94 S.Ct. 2997]; Ghiardi, *The Case Against Punitive Damages, supra,* 8 The Forum 411, 413-414.)

Others correctly criticize when the cost of punitive awards may be passed on to the public, resulting in a public subsidy of plaintiff windfalls. (Note, *Insurance Coverage of Punitive Damages, supra,* 10 Idaho L.Rev. 263, 268; Carsey, *The Case Against Punitive Damages, supra,* 11 The Forum 57, 60.) Such result, obviously contrary to sound public policy (cf. Gov. Code, § 818 (no punitive damages against a public entity)), is nonetheless risked when punitive damages are awarded against an insurer for deficiencies in its claims practice. (Cf. *Borer* v. *American Airlines Inc.* (1977) 19 Cal.3d 441, 447 [138 Cal.Rptr. 302, 563 P.2d 858].) The risk becomes a certainty for mutual insurance companies like Mutual. Because future premiums are based largely on past loss experience and administrative expense in the industry, such premiums can be expected to reflect punitive damages paid by the industry. "The public, then, is in the peculiar and indefensible position of penalizing itself with the payment going as unjust enrichment to someone for whom the tort law, through the medium of compensatory damages, already fully provides." (Long,

---

[1]Because restitution requires the wrongdoer only to disgorge his ill-gotten gains, compensatory damage will not always constitute a deterrent, and punitive damage may be necessary to deter. (*Ward* v. *Taggert* (1959) 51 Cal.2d 736, 743 [336 P.2d 534].) However, when, as in the instant case, potential compensatory damages are not limited to restitution but extend to consequential damages as well, including mental suffering, the risk of potential compensatory damages constitutes a substantial deterrent against wrongdoing.

*Punitive Damages: An Unsettled Doctrine, supra,* 25 Drake L.Rev. 870, 888; Note, *Insurance Coverage of Punitive Damages, supra,* 10 Idaho L.Rev. 263, 268.)[2]

Because each insurer can be expected to attempt to increase its profits and reduce its losses, punitive awards will serve as a substantial deterrent.[3] However, the question raised is whether the deterrent factor is of sufficient importance to justify penalizing the public to support the unjust enrichment of the plaintiff, or whether we should adopt special rules eliminating awards of punitive damages where it is likely the cost will ultimately be borne by the public.[4]

In determining whether the deterrent factor of punitive damages warrants the public punishing itself to unjustly enrich the claimant, it must be borne in mind that there are alternative deterrents to improper insurer claim practices. An insurer improperly denying benefits and breaching its covenant of good faith and fair dealing is not only liable for all compensatory damages—including damages for mental distress—but can also expect to incur substantial counsel fees and litigation expenses. Considering such deterrent factor, I am of the view that the public should not punish itself for the unjust enrichment of the claimant, and we should not impose punitive damages for improper claims practices.

[2]It has also been pointed out that in mass disaster situations, the award of punitive damages to early litigants may well preclude recovery of even compensatory damages to litigants who subsequently recover judgments. (See, Long, *Punitive Damages: An Unsettled Doctrine, supra,* 25 Drake L.Rev. 870, 877.) The same possibility of bankrupting the defendant to the prejudice of bona fide claims for compensatory damages exists whenever the conduct held to warrant punitive award is a widespread or common corporate practice.

[3]While punitive damage award for wrongful claims practice will have a deterrent effect on such practices, I cannot agree with the analysis of footnote 14 of *Neal* v. *Farmers Insurance Exchange* (1978) 21 Cal.3d 910, 929 [148 Cal.Rptr. 389, 582 P.2d 980], that insurers engaging in the wrongful conduct will raise premiums to offset the punitive award whereas other insurers will not, implying that substantial costs will not be passed on to the public. Such analysis ignores the fact that risk of loss for purposes of calculating premiums is ordinarily based on industry-wide losses not the individual company's losses. (Athearn, Risk and Insurance (2d ed. 1964) p. 497; Denenberg et al., Risk and Insurance (1964) p. 383.)

[4]At least four states do not allow punitive damages, recognizing it is the policy of tort law to compensate victims for harm suffered and to limit defendant's obligation to indemnification. (Zuger, *Insurance Coverage of Punitive Damages* (1976) 53 N.D.L.Rev. 239, 249 (La., Mass., Neb., Wash.).) Additionally, three states hold punitive damages are compensatory in nature and limit them accordingly. (*Id.;* N.H., Mich., Conn.)

Although in other situations actions for breach of the obligations imposed by the implied covenant of good faith and fair dealing have been said to sound in both contract and tort, it must be concluded that within the meaning of the punitive damage statute (Civ. Code, § 3294), such an action is one "for the breach of an obligation . . . arising from contract," making the statute inapplicable.

## SUFFICIENCY OF EVIDENCE

Our courts have recognized that the law does not favor punitive damages, granting them only in the most outrageous cases. (*Beck* v. *State Farm Mut. Auto Ins. Co.* (1976) 54 Cal.App.3d 347, 355 [126 Cal.Rptr. 602]; *Ferraro* v. *Pacific Fin. Corp.* (1970) 8 Cal.App.3d 339, 351 [87 Cal.Rptr. 226].) In *Gombos* v. *Ashe* (1958) 158 Cal.App.2d 517, 526-527 [322 P.2d 933], Justice Peters enunciated the limited basis for punitive damages award: "Punitive damages are allowed in certain cases as a punishment of the defendant. They are not a favorite of the law and the granting of them should be done with the greatest caution. They are only allowed in the clearest of cases. In order to warrant the allowance of such damages the act complained of must not only be willful, in the sense of intentional, but it must be accompanied by some aggravating circumstance amounting to malice. Malice implies an act conceived in a spirit of mischief or with criminal indifference towards the obligations owed to others. There must be an intent to vex, annoy or injure. Mere spite or ill will is not sufficient. Mere negligence, even gross negligence, is not sufficient to justify such an award."

Although malice may be proven by circumstantial evidence, the evidence must establish malice in fact rather than malice implied by law. (*Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 66 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878].) Mere breach of the covenant of good faith and fair dealing is in itself insufficient to support a finding of intent necessary to justify an award of punitive damages. (*Silberg* v. *California Life Ins. Co.* (1974) 11 Cal.3d 452, at p. 463 [113 Cal.Rptr. 711, 521 P.2d 1103]; *Beck* v. *State Farm Mut. Auto Ins.* (1976) 54 Cal.App.3d 347, 355-356 [126 Cal.Rptr. 602].) Negligent investigation of a claim, while constituting a breach of the covenant of good faith and fair dealing, does not establish malice in fact.

When an insurer has substantial credible evidence that no further benefits are due under the policy, its refusal to pay additional benefits, without more, may not serve as a basis for awarding punitive damages. If

the rule were otherwise, the trier of fact would have discretion to award punitive damages in any case when upon conflicting evidence it found a breach of the insurance contract. Insurers would be unable to litigate questionable claims and would be required to pay dubious claims in all cases to avoid potential liability for punitive damages. The evidence at trial in the present case was sharply conflicting as to whether any benefits were due under the policy in addition to those previously tendered.[5]

The majority base the allowance of punitive damages on the conduct of McEachen and Segal. Viewing the evidence most favorable to plaintiff, their conduct does not warrant an award of punitive damages.

*McEachen*

Between 1963 and 1970—prior to his instant injuries—plaintiff claimed and received benefit payments for three separate back-related disabling injuries. Plaintiff was injured in May 1970. He made a fourth claim in June for accidental back injury suffered during the course of his employment. Portions of the claim form were completed by both plaintiff and his physician. The physician estimated plaintiff would be able to return to work in August 1970. In September plaintiff upon returning from a trip to Ireland visited the agency and discussed his claim. This discussion resulted in payment to plaintiff under the policy's accident provisions for a three-month period following date of injury.

Plaintiff filed a supplemental claim in October 1970, stating he was unable to return to work. However, his physician, who signed the claim form on 19 October, stated on the form that plaintiff had been disabled

---

[5]The defense elicited testimony from plaintiff's doctors that plaintiff's disability was in large part, perhaps 50 percent, due to "discogenic disease," changes that occur over the years rather than traumatic injury. Medical reports also reflected the presence of the disease. The policy limited accidental benefits to injuries "independent of sickness and other causes."

In addition, there was a sharp conflict of evidence as to whether plaintiff was totally disabled within the meaning of the policy. Prior to the 1971 surgery, plaintiff's doctors repeatedly reported that plaintiff would be able to return to work on specified dates. In addition, the policy provided that plaintiff was not entitled to accidental benefits more than a year from injury unless he was unable to engage in any gainful work or service for which he was reasonably fitted by education, training or experience. Plaintiff's orthopedic surgeon estimated that plaintiff would be able to return to work within three to six months of the surgery. In a report in 1972, the surgeon opined that plaintiff should be restricted from repetitive bending but could be on his feet throughout the day, could occasionally lift as much as 50 pounds, and need not be in a sedentary occupation. The surgeon testified at trial that there were occupations plaintiff could perform within limitations.

only through 29 September.[6] Because of this contradiction, defendant McEachen, an agency claims manager, investigated the claim. McEachen reviewed workers' compensation and State Compensation Insurance Fund medical records. These records indicated plaintiff and the examining physician had earlier agreed on a 1 July 1970 return to work date.

In short, when on 20 November McEachen visited plaintiff *all* of the available medical evidence stated either that plaintiff's disability should have terminated long before 29 September or that it had terminated by that date. Obviously, McEachen faced with the undisputed medical evidence could not reasonably be expected to pay benefits beyond 29 September. Although, as the majority point out, plaintiff may have stated he needed money for the approaching Christmas season, an insurer is not Santa Claus. Plaintiff also offered to be examined by any doctor named by the insurer but since plaintiff's doctor had stated he was not disabled, the onus was not on the insurer to obtain a second opinion.

Insofar as the majority opinion indicates that McEachen should have paid disability benefits for periods after 29 September, it is unreasonable. Insofar as the opinion suggests that McEachen's refusal to pay such benefits furnishes a basis for punitive damages, it is absurd.

It is true that McEachen in denying benefits used intemperate language in stating that plaintiff was a fraud, but in view of the uncontradicted medical reports stating plaintiff was no longer disabled, such language does not warrant an award of punitive damages.[7]

*Segal*

Following his surgery on 26 February 1971, plaintiff submitted a new proof-of-loss form on 5 April 1971. This claim was assigned to defendant Segal, an agency claims adjuster. Segal was aided in his field investigations by claims analyst Romano from Mutual's home office. Although not entirely clear, it appears Romano was assigned to the agency to assist in a

---

[6]The physician testified at trial that when he examined plaintiff on 22 September, he stated he was going back to work on 29 September. When the physician examined plaintiff on 9 October, plaintiff stated his former employer did not have any vacant jobs. This information was not available to McEachen on 20 November.

[7]There were additional circumstances questioning plaintiff's good faith. During his trip abroad, plaintiff was collecting not only on the instant policy but also on a second one from the insurer, and he was entitled to workers' compensation benefits while disabled. (He received a 73 percent disability rating on the compensation claim.)

backlog of field investigations. Romano was not Segal's superior; rather, he occupied a position equivalent to Segal's position with the agency.

Segal and Romano, in the course of their field investigations, reviewed records of Workers' Compensation Appeals Board, State Compensation Insurance Fund, and the hospital where plaintiff's surgery was performed. State Compensation Insurance Fund records contained letters from Dr. Carpenter, plaintiff's surgeon, and Dr. Singelyn. Dr. Carpenter stated in his letter: "[plaintiff's medical] history appears consistent with a man with probable discogenic disease with multiple aggravations over the last several years, finally culminating in a specific incident a little over seven months ago . . . ." Dr. Singelyn stated in his letter: "I would apportion 50% of his current subjective complaints to his industrial injury, and 50% to the natural progression of his preexisting pathology of degenerative wear and tear osteoarthritis of the spine." Neither Segal nor Romano made an effort to reach plaintiff's physicians. Based on Segal's review of medical records, plaintiff's condition was reclassified from one of injury to one of nonconfining illness.

In May 1971 Segal visited plaintiff at home, telling him he suffered from an illness—not an injury. Segal handed plaintiff a check for medical costs and three months' disability payments, the maximum benefits for disability due to nonconfining illness. Plaintiff did not cash the check. He testified he refused Segal's offer of a larger check if plaintiff would surrender his policy.

In addition to the tendered benefits for illness, the policy provided for lifetime benefits if the insured became totally disabled as a result of an accidental injury "independent of sickness and other causes."

The only reasonable construction of the information reviewed by Segal was that plaintiff's disability was due to sickness or other causes in addition to the accident. Plaintiff's surgeon reported discogenic disease, and the other doctor reported preexisting pathology. Again, insofar as the majority opinion may indicate that Segal should have paid accident benefits on the basis of the information available to him, it is unreasonable. Insofar as the opinion suggests that Segal's refusal to pay such benefits warrants an award of punitive damages, it is absurd.

What practices are the majority attempting to deter by allowing punitive damages? Is it an improper insurance practice warranting

punitive damages to deny claims when the medical reports of the plaintiff's treating physicians show that no benefits are due?

The only significant wrongful conduct on the part of the adjusters was that they did not make efforts to discuss the case with the physicians, instead relying upon the physicians' written reports.[8] Testimony at trial established that efforts to discuss the case with the attending physician would ordinarily have been made by a claims adjuster.[9] However, the failure to make efforts to consult the physicians shows only a careless mistake. The adjusters, at most, acted on the basis of a careless mistake. (See *Wolfsen* v. *Hathaway* (1948) 32 Cal.2d 632, 649 [198 P.2d 1].) The fact the information resulted from poor investigation does not elevate their mental states to malice. An act performed on the basis of erroneous information, when the error is unknown, does not constitute oppression or fraud and cannot be equated with conduct "conceived in a spirit of mischief or with criminal indifference . . . . Mere negligence, even gross negligence, is not sufficient to justify" an award of punitive damages. (*Gombos* v. *Ashe, supra,* 158 Cal.App.2d 517, 526-527.)[10]

Moreover, even assuming the adjusters' conduct could be found to be malicious, such conduct may not be imputed to Mutual for purposes of sustaining a punitive award.

Although the doctrine of respondeat superior generally imposes liability on an employer for the torts of its employees, the doctrine will not support an award of punitive damages against a principal. (*Ebaugh* v. *Rabkin* (1972) 22 Cal.App.3d 891, 895 [99 Cal.Rptr. 706].) Punitive damages may properly be awarded against a principal for the acts of its agent only if: (a) the agent was employed in a managerial capacity and acted within the scope of his employment; (b) the principal ratified or approved the act; (c) the principal authorized the performance and

---

[8]Insofar as McEachen was concerned, a discussion with the attending physician would not have been helpful to plaintiff. Such discussion only could have confirmed the conclusion that petitioner's total disability terminated by 29 September. (See fn. 5.)

[9]The majority also suggests that Segal's offer to settle was improper, warranting punitive damages. However, the majority concede that the offer was proper had Segal made a proper investigation. (*Ante,* p. 822, fn. 4.) Accordingly the basis of impropriety is the improper investigation.

[10]There is also evidence of wrongdoing by the insurer in that plaintiff's file was lost in the home office and that the ordinary procedures of review of adjuster's decision to terminate benefits were not followed. The majority do not rely on the breakdown in the insurer's ordinary procedures for review. In any event, the insurer's negligent failure to follow its own procedures may not warrant punitive damages.

manner of performing the act; or (d) the agent was unfit and the principal was reckless in employing him. (*Deevy* v. *Tassi* (1942) 21 Cal.2d 109, 125 [130 P.2d 389]; *Hale* v. *Farmers Ins. Co.* (1974) 42 Cal.App.3d 681, 691 [117 Cal.Rptr. 146]; Rest.2d Torts (Tent. Draft No. 19, 1973) § 909.)

A managerial employee for purposes of imposing punitive damage must occupy a high level *policy-making*—as opposed to a *policy-implementing*—position. (E.g., *Lowe* v. *Yolo County etc. Water Co.* (1910) 157 Cal. 503, 510-511 [108 P.2d 297] [corporate president]; *Davis* v. *Local Union No. 11, Internat. etc. of Elec. Workers* (1971) 16 Cal.App.3d 686, 698 [94 Cal.Rptr. 562] ["No. 2 man"]; *Toole* v. *Richardson-Merrell, Inc.* (1967) 251 Cal.App.2d 689, 712 [60 Cal.Rptr. 398, 29 A.L.R.3d 988] [high level management].) When those who control the corporation, and who are in essence the corporation itself, seek to further its interest through adoption of malicious, oppressive, or fraudulent policies, imposition of punitive damages may achieve its deterrent purpose because such award is directed at the corporation itself. However, to impose punitive damages because one of the corporate employees improperly applied an otherwise lawful and reasonable corporate policy, simply serves to enlarge judgments. In such case, the corporation itself may not properly be considered the actual wrongdoer. It has formulated policies and directed its employees in a manner consistent with the law. The deterrence, if any, is ineffective.

In *Hale* v. *Farmers Ins. Exch., supra*, 42 Cal.App.3d 681, 697, a claims supervisor—a position analogous to McEachen's—with authority to deny claims, was held not a managerial employee for purposes of punitive damages. The fact McEachen possessed authority to accept or reject claims does not warrant finding him a managerial employee. As noted, the claims supervisor in *Hale* possessed such authority. Further, acceptance of such a rule would equate punitive damage liability with respondeat superior liability. Under such an approach virtually any employee having the capacity to effect a decision would be a managerial employee for purposes of assessing punitive damages. This would extend the concept to a vast majority of corporate employees.

The rule that punitive damages may be awarded against a corporation only for the conduct of its managerial employees does not permit a corporation to absolve itself of all responsibility merely by formulating a proper policy without supervising its execution. The corporation remains liable for all compensatory damages resulting from an incorrect decision by its employees. In addition corporate policy forming a basis for

imposition of punitive damages does not require a showing of a formal adoption of the policy by resolution or formal direction by a managing official, but may be established as a de facto policy upon a showing of uniform course of conduct by lower level employees. A single act by one employee in an isolated instance does not, of course, establish a de facto policy. Thirdly, the corporation may incur liability for punitive damages if it ratifies employee conduct.

The award of punitive damages may not be predicated on authorization or ratification of the adjusters' conduct by Mutual. There is no evidence Mutual specifically authorized their conduct. Ratification may not be established by the fact Mutual continued to employ the adjusters. Retention alone cannot support an award of punitive damages. (*Coats* v. *Construction & Gen. Laborers. Local No. 185* (1971) 15 Cal.App.3d 908, 915 [93 Cal.Rptr. 639].) A rule allowing mere retention to support a finding of ratification would be unduly harsh on employees as appears in this case. To allow retention without more to establish ratification would place a tremendous incentive on employers to terminate employees whenever any question concerning their conduct might be raised. (See *Sullivan* v. *Matt* (1955) 130 Cal.App.2d 134, 144 [278 P.2d 499].)

The record is simply not sufficient to sustain an award of punitive damages.

**RICHARDSON, J.,** Concurring and Dissenting.—I concur in the judgment. For the reasons well expressed in Justice Clark's concurring and dissenting opinion, however, I disagree with the majority's conclusion that punitive damages are recoverable under the circumstances presented in this case. As Justice Clark explains, the careless, negligent conduct of claims agents McEachen and Segal would not constitute that form of "oppression, fraud, or malice" required by section 3294 of the Civil Code for imposition of exemplary damages. Moreover, it is doubtful that the conduct of these persons should be imputed to their employer, under the evidence adduced in this case.

Unlike Justice Clark, however, I would not absolutely preclude an award of punitive damages in every case involving a breach by an insurer of the implied covenant of good faith and fair dealing. We have previously held that such a breach sounds in both contract *and tort* (e.g., *Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566, 573-575 [108 Cal.Rptr. 480, 510 P.2d 1032]), and that punitive damages are recoverable for an

aggravated breach of the implied covenant, so long as the insurer has acted " 'with the intent to vex, injure, or annoy, or with a conscious disregard of the plaintiff's rights.' " (*Neal* v. *Farmers Insurance Exchange* (1978) 21 Cal.3d 910, 922 [148 Cal.Rptr. 389, 582 P.2d 980], quoting from *Silberg* v. *California Life Ins. Co.* (1974) 11 Cal.3d 452, 462 [113 Cal.Rptr. 711, 521 P.2d 1103].) My dissent from the majority opinion in *Neal* was directed at entirely different issues from that relating to the above principle.

The *Neal* majority, for example, deemed an award of punitive damages justified by evidence that the insurer was pursuing a conscious policy to utilize the insured's exigent financial circumstances as a lever to force a settlement more favorable to the insurer than the facts otherwise would have warranted. (*Id.*, at p. 923.)

Thus, I would not ·eliminate the possibility of a punitive damages award in an appropriate case, where the acts of the insurer demonstrate actual malice, fraud or oppression. As Justice Clark observes, it is true that the insurer may simply pass on the punitive award to its customers in the form of increased premiums. Yet as the *Neal* majority explained, increased premiums thereby charged may permit the insurer's competitors to obtain a competitive advantage, thus promoting, to a degree at least, the object of deterrence which underlies an award of punitive damages, and "resulting in an ultimate benefit to insurance consumers as a whole." (*Id.*, at p. 929, fn. 14.)

The petitions of appellant Mutual of Omaha and respondent for a rehearing were denied October 11, 1979. Clark, J., and Richardson, J., were of the opinion that the petitions should be granted.