**Dennis WIBLE, Plaintiff,**

v.

**AETNA LIFE INSURANCE COMPANY, the Boeing Company Long Term Disability Plan and the Boeing Company Life Insurance Plan, Defendants.**

**No. CV 04–4219 DT (MCX).**

United States District Court, C.D. California.

June 20, 2005.

Corinne Chandler, Glenn R. Kantor, Kantor & Kantor, Northridge, CA, Russell G. Petti, Russell G. Petti Law Offices, La Canada, CA, for Plaintiff.

Ronald K. Alberts, Berger Kahn, Amber M. McGovern, Maria del Rey, CA, Courtney C. Hill, Stephan, Oringher, Richman and Theodora, Los Angeles, CA, for Defendants.

**ORDER AND OPINION DENYING DEFENDANTS AETNA LIFE INSURANCE COMPANY AND THE BOEING COMPANY GROUP LIFE AND LONG TERM DISABILITY PLAN'S MOTION TO STRIKE PORTIONS OF PLAINTIFF'S EXHIBITS IN THE DECLARATIONS OF RUSSELL G. PETTI AND GLENN R. KANTOR; AND GRANTING PLAINTIFF DENNIS WIBLE'S MOTION FOR SUMMARY ADJUDICATION ON THE PROPER STANDARD OF REVIEW**

TEVRIZIAN, District Judge.

## I. Background

This action is brought by Plaintiff Dennis Wible ("Plaintiff") against Defendants Aetna Life Insurance Company, The Boeing Company Long Term Disability Plan

and The Boeing Company Life Insurance Plan (collectively, "Aetna") for breach of the Employee Retirement Income Security Act of 1974 ("ERISA") and seeking recovery of disability and life benefits, prejudgment and postjudgment interest and attorneys' fees and costs. Plaintiff is trustee of the estate of Marianne Wible ("Ms.Wible"), and currently before this Court is Plaintiff's Motion for Summary Adjudication on the Proper Standard of Review relating to the denial of disability benefits to Ms. Wible.

## A. Factual Summary

The following facts are found to be undisputed[1]:

The Group Life and Long Term Disability Insurance Policy ("Policy") in this matter was issued by Defendant Aetna Life Insurance Company to The Boeing Company. The Policy provides discretionary authority through the following language:

> For the purpose of Section 503 of Title 1 of the Employee Retirement Income Security Act of 1974, amended (ERISA), Aetna is a fiduciary with complete authority to review all denied claims for benefits under this discretionary authority to:

> determine whether and to what extent employees and beneficiaries are entitled to benefits; and construe any disputed or doubtful terms of this policy.

The Policy states that Aetna is obligated to exercise this discretion for the benefit of claimants such as Ms. Wible. Specifically, the Plan recognizes that ERISA fiduciaries "have an obligation to administer the Plan prudently and to act in the interest of you and other Plan participants and beneficiaries."

Under the Policy, for the first 30 months of benefits (6months of short term benefits, and 24 months of long term benefits), Ms. Wible would be disabled if, because of an "accidental injury or illness" she was unable to perform "the material duties of [her] own occupation or other appropriate work the Company makes available." However, after 30 months, Ms. Wible would only be entitled to further benefits if she were disabled "from working at any reasonable occupation for which [she] may be fitted by training, education, or experience."

As of February 12, 2001, Ms. Wible was a fifty-six year old registered nurse, with a regular work history in that occupation. She was then working for Boeing in its "Health Service Unit", providing medical care to Boeing employees. In 1990, Ms. Wible suffered from an unknown illness, which included symptoms of "joint aches, chest pain, fatigue, and severe headaches."

In November of 1990, she experienced a "witnessed grand mal seizure," which led to her being referred to Dr. Daniel Wallace. According to Plaintiff, Dr. Wallace is a nationally recognized Lupus expert, who has authored the definitive clinical reference work as well as leading popular book on the disease, and who, as Clinical Chief of Rheumatology at Cedars–Sinai Medical Center, had been appointed an independent medical expert by Judge Stephen Wilson. Dr. Wallace diagnosed Ms. Wible as suffering from systemic lupus erythematosus ("SLE" or "Lupus") and assumed Ms. Wible's regular care for her condition.

Dr. Wallace began treating Ms. Wible with Prednisone, a steroid, which caused problems with toxicity and also with Ms. Wible's mental acuity. When Dr. Wallace was able to remove Ms. Wible from the

---

1. The findings are based on Plaintiff's Separate Statement of Undisputed Fact and Aetna's Reply to Plaintiff's Uncontroverted Facts and Conclusions of Law, including the objections made therein, and the evidence cited to by the parties in those documents.

steroids, her "cognitive functions" improved, and Ms. Wible became concerned about her ability to return to work. Eventually, with appropriate care, Ms. Wible was able to manage her symptoms and return to full time employment as a nurse, and Dr. Wallace continued to monitor and manage her Lupus. Ms. Wible continued to work, although with occasional flare-ups, in spite of her many documented medical problems which included hypertension, hypothyroidism, rhinitis and reflux disease.

Early in 2000, Ms. Wible began experiencing labored, difficult breathing. She was referred to Dr. Robert N. Wolfe, a pulmonary disease expert. In short order, she underwent a pulmonary function test, a chest CT scan, a biopsy, and a fiberoptic scan of her lungs and airways.

On February 14, 2001, Ms. Wible went on short-term disability. On March 5, 2001, Ms. Wible's STD claim was approved. In explaining why she was unable to work, Ms. Wible explained as follows:

> Due to the shortness of breath, I cannot respond to emergencies. I must walk slow and short distances [sic]. My thought process is not functioning well and making numerous decisions and keeping up with the demand is difficult. Stress aggravates my shortness of breath as well as my forgetfulness and disorganization I am having.

Ms. Wible concluded that "[i]t has been a challenge to do my job for the past several years while the SLE was in remission. It is now impossible."

On April 19, 2001, Dr. Wallace provided an Attending Physician Statement. Dr. Wallace opined that Ms. Wible was disabled from her Lupus. He stated that she suffered from shortness of breath and stated as an "objective finding" that Ms. Wible's lung biopsy had shown "interstitial pneumonitis." Dr. Wallace also indicated that Ms. Wible was limited because of

"steroid psychopathiogy," which he explained somewhat in a treatment note written that same day. "Patient has been on steroids for six weeks at 60 mg a day and is much better. However, the steroids are making her very toxic and it's hard for her to concentrate." He said Ms. Wible was "very cushingoid" (facial features associated with Lupus). Dr. Wallace also indicated in the treatment note that Ms. Wible suffered from a wide range of conditions, including SLE, hypertension, hypothyroidism, reflux and fibromyalgia, as well as the lymphocyctic intestitial pneumonitis. He opined that Ms. Wible was disabled and would never recover sufficiently to return to work.

On June 13, 2001, with her STD benefits nearing an end, Ms. Wible was evaluated for Long Term Disability ("LTD") benefits. On June 26, 2001, Dr. Wallace submitted another APS, affirming that Ms. Wible continued to be unable to work. Ms. Wible submitted a Claim Questionnaire and provided a list of medications she was currently taking for her condition, which included Synthroid, Protonix, Imuran, Prometium, Elavil and Prednasone. Aetna was also provided with a pathology report (from Ms. Wible's biopsy), which confirmed interstitial pneumonia. After a review of Ms. Wible's records, on July 31, 2001, Ms. Wible's claim for LTD benefits was approved.

Shortly after Ms. Wible's claim was approved, her file was sent to Dr. Brent T. Burton, an in-house physician. Dr. Burton reviewed the medical records and spoke with Dr. Wallace. He confirmed Dr. Wallace's opinion that Ms. Wible was disabled both because of her pulmonary problems as well as the cognitive impact of the drugs she was taking. However, he concluded that "there is no objective data contained in this file that document either sufficient respiratory impairment or cognitive dys-

function that would render her unable to work as a registered nurse." He further concluded that "the subjective data reported by Ms. Wible is not supported by objective documentation of impairment that would render her incapable of working as a registered nurse in at least a sedentary or light capacity."

Ms. Wible was informed that an independent medical examination ("IME") would be required. Ms. Wible questioned the need for the examination, suggesting that it was in response to a number of Boeing disability claims which had come in due to layoffs at that company. In response to her inquiry, Aetna informed Ms. Wible, in a telephone call, that it had made the decision that she was disabled from her own occupation, but that it needed to determine her "total work capacity" for when the definition of disability changed to "any occupation." Ms. Wible also suggested, based on her experience with Boeing, why she was being sent for an IME. She believed that Boeing had ordered Aetna to "crack the whip" and start terminating some claims because of all the LOA's and upcoming layoffs.

Ms. Wible was scheduled for an IME with Dr. Pradeep Damle, an expert in Pulmonary Medicine. After conducting his examination, Dr. Damle—a physician selected by Aetna—gave an unqualified opinion that Ms. Wible was indeed disabled from any possible occupation. Dr. Damle confirmed the diagnosis of lymphocytic interstitial pneumonia through that biopsy. He confirmed that Ms. Wible had CT scans which "showed interval increase in the pulmonary nodules and also what appears to be alveolitis involving the right mid lung zones." He also noted the pulmonary function tests which demonstrated her diminished lung functions. Dr. Damle also took into account Ms. Wible's numerous other medical problems, including her fibromyalgia, her seizure disorder and her gastrointestinal problems. Dr. Damle indicated that Ms. Wible's interstitial pneumonia was "moderately severe" and was supported by objective medical findings. He opined that Ms. Wible was receiving adequate treatment for her condition and that "[m]ainly the condition affecting her performance is dyspnea secondary to pulmonary disease. This condition is likely to remain permanent, as there is no improvement despite steroids and immunosupressants on DLCO on pulmonary function testing." Dr. Damle also opined: "Plaintiff's return to work is currently not possible because she has a reduction of DLCO and pulmonary function capacity and gets shortness of breath on moderate exertion. Patient also feels shaky and not capable of making significant decisions while on treatment." Dr. Damle also filled out an "Employability and Impairment Summary Form," which indicated that Ms. Wible's absence from work, due to her condition would be "possibly permanent." He also filled out a Functional Capacities Worksheet, indicating that Ms. Wible was capable of working only two hours a day.

Aetna asked Dr. Damle for "written clarification" why Ms. Wible couldn't work in a sedentary job. Dr. Damle confirmed that Ms. Wible "is likely to become very tired after 3 or 4 hours."

Aetna also hired investigators to conduct sub rosa surveillance on Ms. Wible. These investigators parked outside Ms. Wible's home for four full days, attempting to observe her doing something inconsistent with her claims of illness. During these four days of surveillance, Ms. Wible was only observed outside her home for 25 minutes. A report on Ms. Wible from National Comprehensive Report Plus Associates also failed to turn up any information that she was engaged in work or any other activities.

On January 17, 2002, Aetna received Ms. Wible's Social Security Award letter. The Social Security Administration concluded that Ms. Wible was disabled from all possible work. The listed date of disability was February 14, 2001. Based on this award, Aetna started taking offsets from Ms. Wible's benefits.

Aetna then sought a paper file review from one Dr. Emil J. Bardana, in Portland, Oregon. Dr. Bardana, who specializes in "allergy and clinical immunology," wrote a detailed report where he disagreed with all the conclusions of the physicians who treated or examined Ms. Wible, and agreed with all the conclusions of Dr. Barton, who hired him. With respect to Ms. Wible's Lupus, he stated that "[t]here are no medical records available to verify her diagnosis of [SLE]." With respect to her lymphocytic pneumonitis, he opined that "it would appear that certainly Ms. Wible could perform as a nurse in a variety of less stressful and less physical job descriptions." He continued: "I completely disagree with her treating physicians as well as Dr. Damle who feels that she is essentially disabled or 80% disabled." With respect to her "mentation," Dr. Damle stated:

[I]t appears that she is capable of driving 5 miles 3 × weekly at this time and has been observed doing so as well as completing questionnaires and providing detailed history to physicians who comment that she has 'difficulty with her memory,' but other than this provides no evidence that she has a psychiatric disorder or that she is mentally impaired and unable to perform as a nurse. It might be well to obtain some very defined psychological testing to demonstrate the fact that either she is embellishing the extent of her psychological impairment, or in point of fact has totally normal mental function.

Aetna asked Ms. Wible for a list of her providers, of whom there were nine. These records were obtained and were sent to Dr. Bardana.

Aetna engaged in four more days of sub rosa surveillance of Ms. Wible. Again, other than one trip out, Aetna's investigators were able to ascertain that Ms. Wible was home.

On April 5, 2002, Dr. Wallace met with Ms. Wible again and provided Aetna with another APS. Ms. Wible was apparently on steroids again, and Dr. Wallace noted that the steroids "effect mood, behavior [and] appearance." He also noted that Ms. Wible had "no stamina [or] endurance," was "emotionally labile" and that, because of her present chemotherapy, was "prone to infection."

On June 26, 2002, Dr. Bardana wrote a supplemental report. After reviewing all of the medical records, Dr. Bardana opined that he doubted the diagnosis of Lupus and stated that Ms. Wible was "clearly not disabled on the basis of her SLE." He stated that Ms. Wible does nave lymphocytic interstitial pneumonitis but that "there is little evidence that suggest that she couldn't work doing some mild physical activity because the lung function tests do not support the fact that she has to be completely sedentary at what she does." Other than heavy lifting and jobs which would require frequent bending or lifting of patients, Dr. Bardana opined that "there is no objective evidence of anything that would severely limit Ms. Wible from being able to perform either sedentary or light duty work as a nurse." When asked whether Ms. Wible's condition would worsen, Dr. Bardana stated that "[i]t does appear at the present time that Ms. Wible has improved or at worst has remained stable and will continue to do so under good surveillance and treatment."

Dr. Wallace wrote a response to Dr. Bardana's report. The response pointed out that Dr. Bardana is not a rheumatologist and therefore is not qualified for the opinions he issued: "First of all, Dr. Bardana is not a board-certified rheumatologist, or even a rheumatologist. He is therefore extremely ignorant about lupus, as evidenced in several comments he makes in his narrative." Dr. Wallace pointed out several basic errors by Dr. Bardana:

[Dr. Bardana] refers to the ARA, which has not existed since 1985. Second, he criticizes me for not getting ANAs or anti DNAs on spinal fluid. These tests are not and have never been available and have never been used to diagnose central nervous system lupus. Third, he states that antineuronal antibodies can be elevated after a seizure. The specific type of antineuronal antibody performed by Specialty Laboratories is never positive after seizure. It is only seen in 1 in 1000 healthy people and is very specific for systemic lupus . . . .

Dr. Wallace disputed Dr. Bardana's conclusion that Ms. Wible's type of alveolitis "is very rare for lupus," noting that he himself has seen 20 or 30 such cases. He noted that Dr. Bardana "tends to gloss over factors that contribute" to Ms. Wible's disability, noting for example the "lupus rash" caused by her sun sensitivity, the restrictions caused by her joint pains, her limited manual dexterity and her hypertension, especially when aggravated by stress. Dr. Wallace restated his opinion that Ms. Wible suffered from a loss of cognitive function: "Anybody who has had documented seizures and central nervous system vasculitis will have a certain amount of scarring in their brain, leading to a chronic organic brain syndrome. This is the case with Mrs. Wible and had been documented on her MRI scans. There is no drug that treats this." He notes that Ms. Wible's distress in this area is obvious

to anyone who speaks with her: "It should be clear to anybody who talks to Mrs. Wible for more than a few minutes that she has difficulty placing words and remembering numbers, names and dates." Dr. Wallace concludes as follows: "To conclude, when you have a patient with documented seizures, organic brain syndrome with a mild dementia, hypertension, sun restrictions, inflammatory arthritis, immune suppression, and scarred-down lungs, it does not take a rocket scientist to ascertain that this patient has significant restrictions."

Dr. Barton wrote a response to Dr. Wallace's letter as did Dr. Bardana. Neither of these responses responded to an item identified by Dr. Wallace as indicating Dr. Bardana's lack of expertise regarding lupus.

On August 22, 2003, Aetna denied Ms. Wible's claim. With the denial, Aetna stopped the waiver of premiums on Ms. Wible's company funded, $125,000 life insurance policy.

On December 8, 2003, Ms. Wible, through her counsel, Glenn Kantor, appealed Aetna's decision and asked for a copy of the Policy and her file. On January 16, 2004, not having heard a response, Ms. Blaylock, a paralegal working with Mr. Kantor, wrote again requesting the file and policy. On February 12, 2004, over sixty days after the initial request, Aetna finally responded. It provided a copy of the Ms. Wible's file but not a copy of the Policy, stating that it would have to be obtained from the employer.

On February 12, 2004, at 59 years of age, Ms. Wible passed away. According to her death certificate, signed by coroner J.E. Blinn, Ms. Wible died of "complications of Lupus Erythemoatosus."

On March 8, 2004, counsel for Ms. Wible, Mr. Kantor, informed Aetna of Ms. Wible's death from the condition that Aet-

na contended did not disable her. Mr. Kantor, believing that the severity of Ms. Wible's illness was now proven even to the insurer's satisfaction, requested payment of benefits for the period prior to Ms. Wible's death. On March 11, 2004, Ms. Blaylock provided a copy of Ms. Wible's death certificate and also a copy of Ms. Wible's living will indicating that Plaintiff is to act as the trustee of her estate.

Aetna responded to Mr. Kantor's March 8, 2004 letter by asking to see Ms. Wible's medical records prior to her death. Mr. Kantor wrote to suggest that Aetna solicit Dr. Wallace's opinion. He went on to point out that, even if there were some requirement under the Policy that the insured prove her disability, Ms. Wible's death from her supposedly non-disabling condition might be sufficient justification for Aetna to give her "some belated assistance." Aetna, through its representative, Mark Ackerman, responded on April 14, 2004 stating that it would not review the denial of Ms. Wible's claim until it received updated medical records.

On May 11, 2004, Ms. Blaylock provided Aetna with updated records from Dr. Wolfe and Dr. Wallace. Ms. Blaylock also asked, again, that Aetna solicit the opinion of Dr. Wallace.

In the documents provided, in February 2003, Dr. Wallace noted that Ms. Wible's pulmonary function was improving, and he would attempt to taper her immunosuppressive. However, in May 2003, Ms. Wible's condition flared. According to a radiology report dated May 1, 2003, Ms. Wible's lung condition was worsening: "Worsening of the pattern of a alvaolitis compared to the prior examination of 10–8–10 and 10–22–02. These findings are certainly consistent with active systemic lupus."

In addition, a May 1, 2003 Lung Mechanics test by Dr. Wolfe showed "a moderate restrictive ventilatory defect" and "a severe reduction in diffusing capacity" which Dr. Wolfe found to be "consistent with the patient's known diagnosis of interstitial lung disease." Dr. Wallace responded by restarting Ms. Wible on the steroids and increasing the immuno-suppressive. The medications had their desired effect, and by July 21, 2003, she had returned to her "baseline," although she had also become "very cushingoid." Dr. Wallace, by August of 2003, was once looking into the possibility of tapering off Ms. Wible's steroid, which he began in December of 2003. However, in December of 2003, Ms. Wible's chest scans showed a new factor, the "subtle ground-glass opacity" in her left lung. Dr. Wolfe was unsure if this was the "beginning of a new flare of lupus or whether it represented an infection or other process." In the imaging report, Dr. Julien noted that the condition was "certainly consistent with either an infectious process or recurrence of lupus alveolitis." Dr. Julien also noted that Ms. Wible had been treated with immunotherapy, and the fact that Ms. Wible "has now significantly had her immunosuppressions reduced" made this a particular concern. Follow up scans, taken in January of 2004, which are the most recent medical records available on Ms. Wible prior to her death on February 12, indicated continued uncertainty as to this new factor.

On June 4, 2004, Aetna, through Mr. Ackerman, responded, upholding the denial. Mr. Ackerman did not contact any of Ms. Wible's physicians and did not have Ms. Wible's new medical records reviewed by a nurse or in-house physician. He stated that Aetna "focused our attention on the medical records that fall closest to those dates [the August 15, 2003 date the claim was closed and the February 12, 2004 date of death]." Aetna did not speak with Dr. Wallace prior to upholding its denial.

## B. Procedural Summary

On June 14, 2004, Plaintiff filed the Complaint, and the action was assigned to Judge Matz.

On July 7, 2004, Aetna filed its Answer.

On September 13, 2004, Judge Matz held a Scheduling Conference. He set dates regarding Plaintiff's standard of review motion and the parties' briefs regarding the validity of the decision.[2]

On March 1, 2005, Plaintiff filed a Motion for Summary Adjudication on the Proper Standard of Review.

On March 14, 2005, Aetna filed a Motion to Strike Portions of Plaintiff's Exhibits in the Declarations of Russell G. Petti and Glenn R. Kantor.

On March 28, 2005, Judge Matz held a hearing on Plaintiff's Motion for Summary Adjudication and Aetna's Motion to Strike. He disclosed an ongoing professional relationship with declarant Robert Wolf, M.D. After conferring with counsel, the Court determined that it was necessary to recuse itself. The motions were taken off calendar.

On March 29, 2005, an Order to Reassign Case Due to Self–Recusal was filed, and the action was reassigned to this Court.

On April 7, 2005, this Court issued an Order setting the hearing on Plaintiff's Motion for Summary Adjudication and Aetna's Motion to Strike for this date. This Court also set a Status Conference for this date.

## II. *Discussion*

### A. *Requests for Judicial Notice*

 Plaintiff filed a Request for Judicial Notice wherein he asks this Court to take judicial notice of the following: (1) The Opinion Letter of the California Department of Insurance, dated February 26, 2004; (2) The Amazon web page for *Dubois' Lupus Erthematosus* by Dr. Daniel Wallace et al.; and (3) The Amazon web page for *The Lupus Book: A Guide for Patients and Their Families* by Dr. Daniel Wallace. He also filed a Supplemental Request for Judicial Notice wherein he asks this Court take judicial notice of a page from the web site of the American Academy of Allergy Asthma & Immunology, located on the Internet at the URL http:// www.aaaai.org/patients/publicedmat/tips/roleoftheallergist.stm.

Aetna filed a Request for Judicial Notice wherein it asks this Court to take judicial notice of Memorandum Opinion, *Mitchell v. Aetna Life Insurance Co.*, CV 03–9605 ER (RNBx), filed February 2, 2005.

A court must take judicial notice if a party requests it and supplies the court with the requisite information. Fed. R.Evid. 201(d). "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b).

 A court may take judicial notice of "records and reports of administrative bodies." *Mack,* 798 F.2d at 1282 (citing *Interstate Natural Gas Co. v. Southern California Gas Co.,* 209 F.2d 380, 385 (9th Cir.1953)). In addition, this Court may take judicial notice of its own records, and documents that are public records and capable of accurate and ready confirmation by sources that cannot reasonably be questioned. *See MGIC Indem. Corp. v. Weis-*

---

**2.** The date set for the filing of the parties' briefs regarding the validity of the decision was May 2, 2005.

*man,* 803 F.2d 500, 504 (9th Cir.1986) (courts may take judicial notice of matters of public record outside the pleadings); *United States v. Wilson,* 631 F.2d 118, 119 (9th Cir.1980)("In particular, a court may take judicial notice of its own records in other cases, as well as the records of an inferior court in other cases.").

■ Based on the foregoing, this Court finds that the requests are proper. Aetna objects to Plaintiff's request on the following grounds: hearsay, lack of authentication, certification or verification, and that ERISA limits a Court's review to matter contained in the record at the time of the review. This Court finds that Aetna's objections lack merit as the documents are the proper subject of judicial notice according to Rule 201(b). Furthermore, in determining the standard of review, the Court is permitted to review evidence outside of the administrative record. *Tremain v. Bell Industries, Inc.,* 196 F.3d 970, 976–77 (9th Cir.1999)("In determining whether a plan administrator's conflict of interest affected its decision to deny benefits, evidence outside the administrative record may be considered.").

Thus, this Court grants said Requests for Judicial Notice and hereby takes judicial notice of the aforementioned documents.

### B. *Aetna's Motion to Strike*

Aetna filed a Motion to Strike Portions of Plaintiff's Exhibits in the Declaration of Russell G. Petti and Glenn Kantor. More specifically, it seeks to strike Exhibit 1 to the Declaration of Glenn R. Kantor and Exhibit 2 to the Declaration of Russell G. Petti. In support, it offers the same argument that ERISA limits a Court's review to matter contained in the record at the time of the review. However, as found above, evidence outside of the record may be considered in determining whether a plan administrator's conflict of interest af-

fected its decision to deny benefits. As such, this Court denies Aetna's Motion to Strike.

### C. *Standard for Motion for Summary Adjudication*

Under the Federal Rules of Civil Procedure, summary judgment is proper only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). If the moving party satisfies the burden, the party opposing the motion must set forth specific facts showing that there remains a genuine issue for trial. *See id.;* Fed.R.Civ.P. 56(e).

A non-moving party who bears the burden of proof at trial to an element essential to its case must make a showing sufficient to establish a genuine dispute of fact with respect to the existence of that element of the case or be subject to summary judgment. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Such an issue of fact is a genuine issue if it reasonably can be resolved in favor of either party. *See Anderson,* 477 U.S. at 250–51, 106 S.Ct. at 2511. The non-movant's burden to demonstrate a genuine issue of material fact increases when the factual context renders her claim implausible. *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Thus, mere disagreement or the bald assertion that a genuine issue of material fact exists no longer precludes the use of summary judg-

ment. *See Harper v. Wallingford*, 877 F.2d 728 (9th Cir.1989); *California Architectural Building Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir.1987).

If the moving party seeks summary judgment on a claim or defense on which it bears the burden of proof at trial, it must satisfy its burden by showing affirmative, admissible evidence.

█ Unauthenticated documents cannot be considered on a motion for summary judgment. *See Hal Roach Studios v. Richard Feiner and Co.*, 896 F.2d 1542, 1550 (9th Cir.1989).

█ On a motion for summary judgment, admissible declarations or affidavits must be based on personal knowledge, must set forth facts that would be admissible evidence at trial, and must show that the declarant or affiant is competent to testify as to the facts at issue. *See* Fed. R.Civ.P. 56(e). Declarations on "information and belief" are inappropriate to demonstrate a genuine issue of fact. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

### D. *Analysis for Motion for Summary Adjudication*

In his Motion, Plaintiff seeks summary adjudication on the proper standard of review of the plan administrator's decision to deny Ms. Wible's LTD benefits. More specifically, he asks this Court to determine that the appropriate standard of review on which to decide this case should be de novo. In response, Aetna contends that the appropriate standard of review should be abuse of discretion.[3]

---

**3.** Thus, the merits of Plaintiff's claim regarding the entitlement to the LTD benefits is not before this Court at this time.

### 1. **Applicable law**

█ When a denial of benefits is challenged in a district court under 29 U.S.C. § 1132(a)(1)(B), a review of the administrator's decision is de novo, unless the plan unambiguously confers discretion on the administrator. *Jordan v. Northrop Grumman Welfare Benefit Plan*, 370 F.3d 869, 875 (9th Cir.2004). When an ERISA plan vests its administrator with discretion to determine eligibility for benefits and to construe the terms of the plan, the district court ordinarily reviews the administrator's determination for abuse of discretion. *Lang v. Long–Term Disability Plan*, 125 F.3d 794, 797 (9th Cir.1997)(citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)).

Here, it not disputed that the Plan confers discretion on Aetna:

> For the purpose of section 503 of Title I of the Employee Retirement Income Security Act of 1974, as amended (ERISA), Aetna is a fiduciary with complete authority to review all denied claims for benefits under this policy. In exercising such fiduciary responsibility, Aetna shall have discretionary authority to:

> determine whether and to what extent employees and beneficiaries are entitled to benefits; and construe any disputed or doubtful terms of this policy.

(Administrative Record at 21; Exh. 1 of Petti Decl. at P 4.)[4] As such, because the Plan confers discretion on the administrator, review of the decision would be for abuse of discretion.

█ De novo review may nevertheless be appropriate despite an unambiguous conferral of discretion. In such cases, the

---

**4.** Hereinafter, citations to the Administrative Record and Exhibit 1 of the Petti Declaration, which are excerpts from the Administrative Record, will be referred to as "AR __; P __".

abuse of discretion standard can be heightened only by a "serious" conflict of interest. *Jordan,* 370 F.3d at 875. This does not mean that the plan has an interest that conflicts in the ordinary sense of the word with the interest of the claimant. Such is an apparent conflict which exists where, as here, the insurance policy is both issued and administered by the same party. Rather, "in order to establish a 'serious' conflict of interest—and thus to substitute a heightened standard of review for abuse of discretion review in ERISA cases—the beneficiary has the burden to come forward with material, probative evidence, beyond the mere fact of the apparent conflict, tending to show that the fiduciary's self-interest caused a breach of the administrator's fiduciary obligations to the beneficiary." ' *Id.* (quoting *Bendixen v. Standard Ins. Co.,* 185 F.3d 939, 943 (9th Cir. 1999)). While "[t]he Ninth Circuit has never explicitly defined the parameters or contours of what might suffice to constitute a breach of fiduciary duty in this context," (*Firestone v. Acuson Corp. Long Term Disability Plan,* 326 F.Supp.2d 1040, 1052 (N.D.Cal.2004)), it has, without declaring an exhaustive list, stated that "material, probative evidence" may consist of "inconsistencies in the plan administrator's reasons, insufficiency of those reasons, or procedural irregularities in the processing of the beneficiaries claims." *Nord v. Black & Decker Disability Plan,* 356 F.3d 1008, 1010 (9th Cir.2004).

■ If the beneficiary produces such material, probative evidence, then the plan "bears the burden of rebutting the presumption by producing evidence to show that the conflict of interest did not affect its decision to deny or terminate benefits." *Tremain v. Bell Industries, Inc.,* 196 F.3d 970, 976 (9th Cir.1999)(quoting *Lang,* 125 F.3d at 798). If the plan fails to carry this burden of rebutting the presumption, then the de novo standard of review is applied. *Id.*

### 2. The record reflects material, probative evidence which shows that Aetna's self-interest caused a breach of its fiduciary obligations

Plaintiff contends that there are three bases to reduce the standard of review to de novo: (1) Aetna breached its fiduciary duty as evidenced by Aetna's ignoring medical opinions, failing to obtain its own competent medical opinions and deliberately considering only evidence pointing to denial; (2) Aetna failed to conduct an adequate investigation prior to denying Ms. Wible's claim; and (3) recent opinions by the California Department of Insurance establish that discretionary clauses like that contained in the present Policy are contrary to law.

■ This Court agrees with Plaintiff's first two bases, and as a result, it does not consider the third. Under the Policy, Aetna was obligated to "act in the interest of [Ms. Wible] and other Plan participants and beneficiaries." (AR 87.) Under Federal law, an ERISA fiduciary must conduct a good faith investigation:

> While a fiduciary has a duty to protect the plan's assets against spurious claims, it also has a duty to see that those entitled to benefits receive them. It must consider the interests of deserving beneficiaries as it would its own. An ERISA fiduciary presented with a claim that a little more evidence may prove valid should seek to get to the truth of the matter.

*Gaither v. Aetna Life Ins. Co.,* 394 F.3d 792, 807–808 (10th Cir.2004) (footnote omitted). Finally, under unpreempted California insurance law, Aetna has a duty to fully investigate claims. "It is essential that an insurer fully inquire into possible bases that might support the insured's claim." *Egan v. Mutual of Omaha Ins. Co.,* 24 Cal.3d 809, 819, 169 Cal.Rptr. 691, 620 P.2d 141 (1979).

More specifically, as set out below, this Court concludes that the record reflects unrebutted material, probative evidence tending to show that Aetna's self-interest caused a breach of its fiduciary obligations to Ms. Wible.

### a. Aetna discounted the opinion of Dr. Wallace

Aetna ignored, or at a minimum discounted, the opinion of Dr. Wallace. For over ten years, Dr. Wallace treated Ms. Wible during her battle with Lupus. Ms. Wible's medial records show that during flares, she would have to be treated with powerful steroids and immunosuppressives, which would manage Ms. Wible's symptoms, but their toxic nature would cause other negative impacts, including a lack of cognitive function and a susceptibility to other illnesses. As an example that Aetna ignored Dr. Wallace's opinion, Plaintiff points to Dr. Wallace's statements about the impact of the drugs Ms. Wible was taking. As Plaintiff argues, Aetna disregarded the impact of Ms. Wible's medication on her mental state.

 Aetna stated that Dr. Wallace's determination regarding Ms. Wible's mental state was unsupported, that there was "no indication that [Ms. Wible was] being treated for [her] mental health condition" (AR 425; P 21) and that she had not undergone a "mental status exam" or any other psychological testing to determine the scope of her disability. (AR 1318; P 175.) Aetna fails to explain why Dr. Wallace could not opine regarding Ms. Wible's mental difficulties given the fact that degradation of mental facilities in some patients is a documented side effect of the steroids taken as treatment. Indeed, had Aetna believed such tests were necessary before paying continued benefits, it could have ordered them. It did not, and Aetna cannot refuse to credit Dr. Wallace's statements about Ms. Wible's loss of cognitive function, which he stated was obvious during even a short conversation with her, through the absence of tests they never required and Dr. Wallace didn't need.

In its Opposition, Aetna contends that there was "substantial evidence in the record contradicting Dr. Wallace's conclusions regarding Ms. Wible's ability to work," yet it fails to cite to any such evidence. It makes the same assertion that it made at the time of denial—that Dr. Wallace's opinion was not supported by "objective data." Essentially, then, it ignores unfavorable evidence on the basis that it is not supported by other, non-existent evidence. Aetna fails to provide any evidence contradicting the statements of Drs. Wallace and Damle that Ms. Wible suffered from memory loss and loss of concentration as a result of the drugs she was taking.

In sum, as Dr. Wallace states in his response to Dr. Bardana:

> To conclude, when you have a patient with documented seizures, organic brain syndrome with a mild dementia, hypertension, sun-restrictions, inflammatory arthritis, immune suppression, and scarred-down lungs, it does not take a rocket scientist to ascertain that this patient has significant restrictions.

(AR 1285; P 156.)

### b. Aetna discounted its own IME opinion

As Plaintiff points out, insurers have a legitimate concern that the treating physician's opinion might favor the insured even though "treating physicians, as a rule, have a greater opportunity to know and observe the patient as an individual." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003)(internal quotation marks and citation omitted). Similarly, the insured has a similar concern about "consultants" hired by the insurer. "And

if a consultant engaged by a plan may have an 'incentive' to make a finding of 'not disabled' so a treating physician, in a close case, may favor a finding of 'disabled.'" *Id.* It stands to reason, then, that the opinion of an independent qualified physician based on an actual examination of the claimant should be considered as reliable evidence. Although Aetna did conduct such an independent examination, and this examination resulted in an unqualified opinion that Ms. Wible was disabled, Aetna essentially ignored this opinion, and it fails to explain substantially why.

 Aetna argues that Dr. Damle contradicted Dr. Wallace because Dr. Damle indicated that Ms. Wible would be able to do sedentary work. However, a review of the record shows that this statement is oversimplified. Dr. Damle stated that Ms. Wible's "return to work is currently not possible" due to her " reduction of DLCO and pulmonary function capacity," because she "gets shortness of breath on moderate exertion" and because she is "not capable of making significant decisions while on treatment." (AR 590; P 86.) In his functional capacities report, Dr. Damle stated that Ms. Wible could only work two hours a day. (AR 594; P 88.) He did state that Ms. Wible, from a perspective of her pulmonary function only, "will be able to do sedentary work." (AR 536; P 61) However, he also stated that "[s]he is likely to become very tired after 3 or 4 hours" and that "her memory is poor and she feels that she cannot accept responsibility due to this." (*Id.*) At the very best, then, it can be said that Dr. Damle opined that Ms. Wible could do sedentary work for 3–4 hours which did not require use of her cognitive facilities.[5]

Furthermore, Aetna's denial letter fails to acknowledge Dr. Damle's report. In the letter, Aetna states that it "took the following into consideration in making our determination" and proceeds over the next three pages to set out a detailed listing of evidence which it claims to have considered. (AR 424–27; P20–23.) Dr. Damle's opinion is nowhere mentioned as having been utilized in the decision to deny benefits. In fact, the letter gives no indication that Ms. Wible had even been sent to an IME, much less that the IME had concluded she was disabled.

### c. Aetna ignored its own surveillance

Aetna ignored its own surveillance which showed that Ms. Wible lived the life of a seriously disabled person. In the course of handling this case, Aetna engaged in an intense regimen of covert surveillance. Specifically, for eight full days, Aetna used investigators to watch Ms. Wible. This surveillance demonstrated that Ms. Wible was, in fact, living the life one would expect of a seriously disabled person. A summary of the surveillance is as follows:

- October 27, 2001—Ms. Wible was not seen (AR 579; P 76);
- November 9, 2001—Ms. Wible left her residence for a brief period to walk a visitor to her car, otherwise stayed in the house all day (AR 580; P 77);

---

5. Under unpreempted California law relating to regulation of insurance policies, the ability to work sporadically or part time is an insufficient ground on which to deny benefits under a "total disability" policy: "Recovery is not precluded under a total disability provision because the insured is able to perform sporadic tasks, or give attention to simple or inconsequential details incident to the conduct of business." *Erreca v. Western States Life Ins. Co.,* 19 Cal.2d 388, 396, 121 P.2d 689 (1942); *see also Moore v. American United Life Ins. Co.,* 150 Cal.App.3d 610, 630, 197 Cal. Rptr. 878 (1984)(holding that employee is totally disabled unless he is capable of "working *with reasonable continuity* in his customary occupation or in any other occupation in which he might reasonably be expected to engage.")(Emphasis in original.)

- November 10, 2001—Ms. Wible left her residence for a brief period to go through the drive-thru at a Del Taco, otherwise stayed inside her home (AR 58–81; P 77–78);
- November 13, 2001—Ms. Wible drove a friend to an AM/PM and waited in the car while the friend shopped. Later, Ms. Wible was driven by her husband to a burger restaurant for lunch, and later she went to a medical appointment (AR 581–83; P 78–80);
- March 21, 2002—Ms. Wible was seen going to Vons and then K–Mart with an elderly couple, otherwise she stayed in her home all day (AR 964);
- March 22, 2002—Ms. Wible left her home for about two minutes while she talked to a friend on the sidewalk, otherwise she stayed in her home all day (AR 864);
- March 23, 2002—Ms. Wible was not seen (AR 965);
- April 3, 2002—Ms. Wible stayed inside her home all day (AR 1335–6; P 189–90).

These surveillance results were consistent with Ms. Wible's described claims and activities. Instead of finding inconsistent activities because the claimant did not know someone was watching, Aetna found the opposite. As such, it conveniently chose to ignore the results. Aetna did not mention the surveillance either in the denial letter or the uphold letter.

### d. Aetna ignored the Social Security Administration's finding that Ms. Wible was disabled

■ Aetna ignored that the Social Security Administration ("SSA") found Ms. Wible disabled. The SSA decision is not binding on Aetna, and Aetna may legitimately come to a different conclusion. However, an SSA determination is evidence of a claimant's disability (*see Kirwan v. Marriott Corp.*, 10 F.3d 784, 790 n.

32 (11th Cir.1994)), and in being challenged as to why it ignored the decision, Aetna fails to address this in its Opposition. As such, this is just another indication that, in making its determination whether Ms. Wible was disabled, Aetna followed a pattern of considering only those few pieces of evidence that supported its claim.

### e. Aetna relies on the opinion of Dr. Bardana who neither treated nor saw Ms. Wible but instead conducted a paper review

In spite of the fact that Ms. Wible's treating physicians opined that she was severely disabled, and in spite of the fact that Aetna's own IME physician agreed that Ms. Wible was severely limited, Aetna decided to ignore these opinions in favor of a paper file review by still another physician. In other words, Aetna relied on a single physician who had not treated or seen Ms. Wible as opposed to the physicians who had treated and seen Ms. Wible. Besides the apparent problem with this, this Court agrees with the two other problems asserted by Plaintiff: (1) Dr. Bardana is an allergist/immunologist and not qualified to opine on the issue of Ms. Wible's disability from her Lupus and (2) a review of Dr. Bardana's report shows that he provided only reasons to deny Ms. Wible's claim.

Dr. Wallace, in claiming that Dr. Bardana was not the proper specialist to evaluate Ms. Wible's claim, pointed out specific errors showing that Dr. Bardana did not know about Lupus. He identified the following:

- Dr. Bardana's reference to the ARA, which has not been in use for 20 years;
- Dr. Bardana's statements that Dr. Wallace should have gotten ANAs or antiDNAs on spinal fluid, when these tests "have never been available and

have never been used to diagnose central nervous system lupus;" and

- Dr. Bardana's statement that antineuraonal antibodies can be elevated after a seizure, when if fact that specific antibody at issue "is never positive after seizure" and "is only seen in I in 1000 healthy people and is very specific for systemic lupus".

(P 155.) Although both Dr. Bardana and Dr. Burton responded to Dr. Wallace's statement, neither of them challenged these statements by Dr. Wallace as being incorrect. Instead, Dr. Bardana non-responsively stated that he would not "stoop" to "character assassination" in order to avoid making specific responses to the errors in his report identified by Dr. Wallace.

According to the web site of the "American Academy of Allergy, Asthma & Immunology," Dr. Bardana's own organization, the primary area of specialty for allergist/immunologists is treating allergies and asthma. (Supp. Req. for Judicial Notice, Exh. A.) Ms. Wible had Lupus which, in turn, caused a related interstitial pneumonitis. Therefore, Dr. Wallace pointed out the appropriate experts were a rheumatologist for Ms. Wible's Lupus and a specialist in pulmonary medicine for the related lung disorder. In their response to Dr. Wallace, neither Dr. Bardana nor Dr. Burton questioned these assertions or explained why they believed a physician who is not qualified to treat a Lupus patient is qualified to evaluate the disability status of a patient who claimed to have Lupus. Indeed, at no time during her medical history did any of her many medical providers [6] determine there was a need to send her to an allergist/immunologist for treatment or a second opinion. Aetna's own IME physician, Dr. Damle, opined that Ms. Wible was receiving adequate care. (P 85.) In fact, when confronted with the initial choice of which physician to use for its IME, Dr. Burton and Aetna sent Ms. Wible to an expert in pulmonary medicine, Dr. Damle. (P 82–86.) It wasn't until after Dr. Damle examined Ms. Wible and confirmed the opinion of Dr. Wallace that Aetna decided to have Ms. Wible's file reviewed by an allergist.

In arguing that Dr. Bardana's report was biased, Plaintiff points to the manner in which Dr. Bardana deals with Ms. Wible's cognitive difficulties. Over the years he treated Ms. Wible, Dr. Wallace stated that the medications she was taking to control her Lupus were toxic and caused cognitive difficulties. (See, e.g., 1419, 1405; P 209, 195.) Dr. Bardana recognized that Dr. Wallace has repeatedly noted the mental difficulties caused by Ms. Wible's steroids (AR 1310, 1313, 1315; P 167, 170, 172), as did Dr. Damle (AR 1321; P 178). Nonetheless, although he never met or spoke with Ms. Wible, Dr. Bardana believed that Ms. Wible might be "embellishing" her problem:

It might be well to obtain some very defined psychological testing to demonstrate the fact that either she is embellishing the extent of her psychological impairment, or in point of fact has totally normal mental function.

(AR 1327; P 184.) In addition, Dr. Bardana claimed that Ms. Wible cannot have any cognitive dysfunction because of her ability to engage in "completing questionnaires." (AR 1327; P 184.) However, there is only a single questionnaire in the record (AR 672–73; P 102–103), and the questionnaire is required by Aetna to qualify for disabili-

---

**6.** Ms. Wible's primary treating physician for Lupus was Dr. Wallace, a rheumatologist; she was treated by a pulmonary expert, Dr. Wolfe; her x-rays were reviewed by a radiologist, Dr. Julian (P 231); she used an internist for regular medical care, Dr. Madhavan (P 168–89); and she was referred to specialists for her back pain (AR 1322; P 179.)

ty. Plus, nothing precludes Ms. Wible from getting help in filling out the questionnaire.

Dr. Bardana's primary reason for believing Ms. Wible was not forthcoming regarding her mental state were the surveillance results. According to Dr. Bardana's review of the surveillance reports, Ms. Wible was surveilled for four days with the following results: on one of those days, she was seen driving an elderly couple to a grocery store and a K–Mart, where she shopped; on another day, she was briefly seen outside her home when she "engaged" a man (AR 1322–23; P 179–80) and inspected "the outer exterior of a motor home." (AR 1323; P 80.) However, with respect to this last action, the surveillance report indicates that Ms. Wible did nothing that day (March 22, 2002) other than talk to the man outside her home, after which she returned to her home. (AR 973.)[7] These actions were relied on by Dr. Bardana to diagnose the level of Ms. Wible's cognitive impairment, yet they were not even mentioned by Aetna in its denial letters. Significantly, according to Dr. Bardana, the only action taken by Ms. Wible in four days is that Ms. Wible drove to a grocery store and K–Mart where she shopped (for a total of 2 hours), and Dr. Bardana was able to assess Ms. Wible's mental state thereon, disagreeing with both her treating physician and the IME physician.

Aetna, in its Opposition, makes much of the fact that it "did not provide inconsistent reasons for denying Ms. Wible's claim" and therefore, did not breach its fiduciary duty. However, Plaintiff does not contend that Aetna provided inconsistent reasons. In fact, Plaintiff contends that Aetna searched for a basis to deny Ms. Wible's claim and then when it came upon one as provided by Dr. Bardana, it

stuck to it and ignored all other contradictory evidence. Similarly, Aetna argues that it "systematically requested all of Ms. Wible's medical records, initiated IME appointments, employed medical specialists to examine and/or review Ms. Wible's file and conducted surveillance and labor market research." Again, that Aetna engaged in these actions may tend to support its claim of conducting some investigation; however, it cannot be said to be enough to merely engage in these actions if it then ignores the results, or picks and chooses which results it wants to follow, or initiates these actions merely to find a basis to deny benefits.

**f. Aetna's actions after Ms. Wible's death shows a continued intent to ignore evidence suggesting its denial was incorrect**

As Plaintiff argues, the way Aetna acted when it learned of Ms. Wible's death shows a continued intent to ignore evidence suggesting its denial was incorrect. As stated above, Ms. Wible died within six months of her claim being denied. According to the death certificate which Plaintiff provided to Aetna, the cause of death was "complications of Lupus Erythematosus." (AR 1191; P 136.) The cause of death was the very condition on which Ms. Wible sought LTD benefits. In response to the request to review Ms. Wible's claim after her death, Aetna stated that it "will toll the appeal of Ms. Wible's claim for 30 days until we have been provided with all medical notes dating from the time of the claim closure to Ms. Wible's death." (AR 366; P 12.)

■ Upon being provided the medical records, however, Aetna focused on only those aspects of the evidence which would

---

7. Similarly, Dr. Bardana also relies on Ms. Wible's driving which he states was five miles three times of week; however, the record reflects that she stated that she drove five miles two times a week. (AR 673; P 103.)

support its denial. Aetna refused to credit the death certificate showing that Ms. Wible died of Lupus complications, because Ms. Wible did not die in a hospital, and because there was no indication on what information the coroner relied on in reaching his conclusion. (AR 761; P 116.) However, Ms. Wible's death certificate is evidence that she died of Lupus complications. *See Heighley v. J.C. Penney Life Insurance,* 257 F.Supp.2d 1241, 1256 n. 12 (C.D.Cal.2003)("With respect to the Death Certificate, it is true, as Defendants assert, that a death certificate is 'prima facie evidence of the fact stated therein'") [citations omitted]. While the specific information that the coroner relied on in reaching his conclusion is not in the record, there is a presumption that officials carrying out a public duty are doing so properly. *See, e.g.,* Cal. Evid.Code s 664 ("It is presumed that official duty has been regularly performed.") Aetna currently does not provide, and at the time of the continued denial failed to provide, evidence to support any contention that the coroner failed to obtain the necessary information to adequately support his conclusion that Ms. Wible died of Lupus complications.

Aetna offers no explanation as to what, in its opinion, caused Ms. Wible's death. Instead, it simply stated that it was "not able" to determine that Ms. Wible had died of Lupus. It points to no other evidence supporting another cause of death.

Furthermore, when Aetna received the medical records it requested, it failed to turn them over to a physician to evaluate whether those records, coupled with Ms. Wible's death, might provide grounds for reconsideration of the denial. Instead, Aetna had the medical records evaluated by Mr. Ackerman, a "Senior Technical Specialist." First, as Plaintiff points out, Mr. Ackerman fails to respond to Plaintiff's challenge as to the basis for his ability to review these complex medical records

without any professional assistance and overrule the opinions of Ms. Wible's treating physician. Moreover, the new medical records showed that Ms. Wible suffered a significant flare up in May 2003, requiring an increase in her medication. (417, 421; P 17–18.) However, Mr. Ackerman arbitrarily limited the scope of his review to the events around the denial and the death. (762; P 116.) Aetna, in its Opposition, fails to respond to this.

Finally, Aetna fails to explain why it never contacted Dr. Wallace, even after being requested to do so. One would think that Ms. Wible's death would have given Aetna some indication that perhaps its reliance on Dr. Bardana's opinions may be misplaced. Indeed, Ms. Wible died of the very condition which Aetna claimed did not prevent her from working.

### 3. A de novo standard of review is warranted as a matter of law

In sum, this Court concludes that Plaintiff has "come forward with material, probative evidence, beyond the mere fact of the apparent conflict, tending to show that the fiduciary's [Aetna's] self-interest caused a breach of the administrator's fiduciary obligations to the beneficiary," and Aetna has failed to present any evidence to rebut the resulting presumption. The record reflects that Aetna ignored, or at best, discounted the opinion of Ms. Wible's longtime treating physician, Dr. Wallace. Aetna then sent Ms. Wible for an IME with a physician of its own choosing, Dr. Damle. It proceeded to discount Dr. Damle's opinion. Aetna ordered surveillance of Ms. Wible for eight full days and discounted the results of the surveillance. It ignored the fact that Ms. Wible was found to be disabled by the Social Security Administration. Instead, Aetna chose to focus on the file review of Dr. Bardana, a physician who never met or spoke to Ms. Wible.

Significantly, Aetna failed to take the fact of Ms. Wible's death, within six months of the denial of her claim, into account. The sum of this evidence shows that Aetna was "bent on denying [Ms. Wible's] claim" and "oblivious to [its] fiduciary obligations as an administrator of the LTD Plan." *Friedrich v. Intel*, 181 F.3d 1105, 1110 (9th Cir.1999). Because Aetna failed to act as a fiduciary, it should not be entitled to a deferential standard of review to which a fiduciary is normally entitled. Accordingly, this Court concludes that the proper standard of review of the plan administrator's decision to deny benefits is de novo as a matter of law.[8]

### III. *Conclusion*

Accordingly, this Court denies Defendants Aetna Life Insurance Company and The Boeing Company Group Life and Long Term Disability Plan's Motion to Strike Portions of Plaintiff's Exhibits in the Declarations of Russell G. Petti and Glenn R. Kantor; and **grants** Plaintiff Dennis Wible's Motion for Summary Adjudication on the Proper Standard of Review.

IT IS SO ORDERED.

---

8. As stated above, Plaintiff also asks this Court to find that de novo review is warranted on the basis that the language granting discretion to Aetna in the Policy violates California insurance law. Based on the determinations set forth herein, this Court concludes that it need not address this additional argument.